IN RE APPLICATION OF MIDWEST LIVESTOCK COMMISSION COMPANY, INC., McCOOK, NEBRASKA, FOR A MARKET LICENSE TO CONDUCT A LIVESTOCK AUCTION MARKET. MIDWEST LIVESTOCK COMMISSION COMPANY, INC., APPELLANT, V. TRI-STATE LIVESTOCK COMMISSION COMPANY ET AL., APPELLEES.

151 N. W. 2d 908

Filed June 30, 1967.    No. 36600.

Charles Thone and Charles M. Bosley, for appellant.

Nelson, Harding, Acklie, Leonard & Tate and Russell, Colfer & Frazier, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is an appeal from a judgment of the district court for Red Willow County denying the application of the Midwest Livestock Commission Company for a livestock auction market license under the Nebraska Livestock Auction Market Development Act, sections 54-1157 to 54-1186, R. S. Supp., 1965.

The record discloses that Midwest made an application to the Nebraska Livestock Auction Market Board for a license to conduct a livestock auction market. Protests were filed by Tri-State Livestock Commission Company, McCook, Nebraska, Chester G. Youngs, Harry H. Eiler, Leslie W. Horn, Western Livestock Auction Co., Farmers Livestock Sales Co., Republican Valley Livestock Auction, Ogallala Livestock Commission Co., Lexington Livestock Commission Co., Imperial Auction Market, Farmers Livestock Sales Co., Beaver Valley Livestock, Elwood Livestock Commission Co., Curtis Livestock Commission Co., and Nebraska Livestock Markets Association. After a hearing, the board granted the application. On appeal to the district court, that court found that the grant of the license would not beneficially serve the livestock economy, is contrary to the law and the evidence, and, consequently, that the order granting the license is arbitrary and capricious. The applicant, Midwest, thereupon appealed to this court.

The applicable statute provides as follows: "The hearing required by section 54-1162 shall be heard by two or more members of the board. If the board deter-

mines, after such hearing, that the proposed livestock auction market would beneficially serve the livestock economy, it shall issue a market license to the applicant. In determining whether or not the application should be granted or denied, the board shall give reasonable consideration to: (1) The ability of the applicant to comply with the federal Packers and Stockyards Act, 1921, as amended; (2) The financial stability, business integrity and fiduciary responsibility of the applicant; (3) The adequacy of the facilities described to permit the performance of market services proposed in the application; (4) The present needs for market services or additional services as expressed by livestock growers and feeders in the community; and (5) Whether the proposed livestock auction market would be permanent and continuous." § 54-1163, R. S. Supp., 1965.

A declaration of policy is contained in the act which states: "It is hereby declared to be the policy of the State of Nebraska, and the purpose of this act, to encourage, stimulate and stabilize the agricultural economy of the state in general, and the livestock economy in particular, by encouraging the construction, development and productive operation of livestock auction markets as key industries of the state and those markets' particular trade areas, with all benefits of fully open, free, competitive factors, in respect to sales and purchases of livestock." § 54-1157, R. S. Supp., 1965.

The protestants complain that the applicant failed to adduce sufficient evidence that it had the ability to comply with the federal Packers and Stockyards Act as required by the Nebraska act. The only evidence on the subject was supplied by an attorney employed by the applicant. His testimony was that he had been in contact with the federal administrator of the Packers and Stockyards Act for Nebraska by letter and telephone. All steps had been taken preliminary to the grant of the license by the Nebraska board which could be taken. While there is no assurance by the federal administrator

that the federal license would be granted, the federal administrator gave assurances of continued cooperation in the procurement of the federal license without any inference that the applicant might not be qualified. The application has been made out and its filing is contingent only upon the grant of the state license by the Nebraska board. Protestants offered no evidence on this point and failed to point up any reason why the applicant would be unable to qualify for the federal license if the Nebraska application was granted. The evidence was sufficient to sustain a finding of the Nebraska board that the applicant had the ability to comply with the federal Packers and Stockyards Act.

Protestants also contend that the evidence does not sustain the board's finding that the applicant had the financial stability, business integrity, and fiduciary responsibility required by the act. No evidence was offered and no contention is here made that the officers and stockholders of the applicant were lacking in business integrity and fiduciary responsibility. In fact, the evidence indicates that the officers and stockholders were men of integrity and responsibility. Protestants appear to concur with the applicant's evidence in this respect.

The financial stability of the applicant corporation raises a different question. The evidence shows that the 10 incorporators of the Midwest Livestock Commission Company are large-scale ranchers and farmers in the McCook area. Each of the incorporators purchased and paid for one share of stock in the amount of $100 to cover the expenses of incorporation. The articles of incorporation have been adopted and filed with the Secretary of State. The expenses for incorporation have been paid, or the money is available for their payment. The amount of capital stock authorized is 2,500 shares with a par value of $100 each. It is the plan of the corporation to sell stock in the amount of $250,000 upon attaining a license under the Nebraska Livestock Auc-

tion Market Development Act and compliance with the federal Securities and Exchange Commission and state Department of Banking rules and regulations governing the issue and sale of stock. With this money acquired through the sale of the 2,500 shares of stock of the applicant, the corporation plans to purchase the land required and to construct the necessary buildings, pens, fences, and other facilities needed to carry on a modern livestock auction market. Protestants contend that after the construction of the needed facilities in accordance with the plans and estimated costs, there will be $12,500 remaining to carry on operations, an amount they deem inadequate. They assert also that none of the stockholders have had experience in operating a livestock auction market and that this want of experience reacts unfavorably to the grant of a license. The president of the corporation testified that it is the plan of the board of directors to lease the facilities to an experienced operating agency or, if necessary, to employ an experienced manager to manage the business. Some complaint is voiced that no application has been made to the state Department of Banking to register these securities and to comply with the Blue-Sky Law as to their sale to the public. But this is not a bar to the grant of the license. In any event, compliance with the Blue-Sky Law is essential as a condition precedent to the offer of the stock for sale. If such compliance is not had and the stock is not sold, the purpose of the license is defeated unless the money is obtained by means without the scope of the Blue-Sky Law and the jurisdiction of the Securities and Exchange Commission. We fail to see where the failure to comply with the regulations of the Securities and Exchange Commission and the state Department of Banking is very important to the issue before us in the absence of evidence that compliance cannot be had with the regulations of these two agencies. There is no merit in the contention that compliance need be had with these two agencies since such compliance

becomes important only after the obtaining of a license under the Livestock Auction Market Development Act. We conclude that the evidence is sufficient to sustain the finding of the board that the financial stability of the applicant is adequate.

The statute also requires that the board give reasonable consideration to the adequacy of the facilities described to permit the performance of market services proposed in the application. Protestants concede in their brief that the proposed facilities are adequate. It is their contention that the construction of the proposed facilities is so conjectural and speculative under the plan testified to that there is no assurance that they can or will be built. We must assume that if sufficient stock is not sold and money thereby obtained to construct the facilities, the facilities will not be built. The board is not required to substitute its judgment for that of the board of directors of the corporation. It is true, of course, that the success of the corporation is dependent on its ability to sell its stock, which is true of most new corporate ventures. Protestants are concerned only with the entry of the new livestock auction market into the competitive field. If the applicant does not enter the field, for financial reasons or otherwise, their fears have been alleviated and their concern no longer exists. Every new venture is subject to some risks. If certainty of success must be guaranteed before a license is issued, few licenses would be granted. We think the adequacy of the proposed facilities is established. The continued existence of the license is contingent upon compliance with the terms of the application. A failure to comply therewith subjects the applicant to a possible revocation of the license. This affords protection to the public, one of the basic reasons for the board's existence.

The more serious contention of the protestants is the requirement of the statute that the board give reasonable consideration to the present needs for market services or additional services as expressed by livestock

growers and feeders in the community where the proposed facility is to be established and operated. The board found that there was a present need for additional market services for livestock growers and feeders in the McCook area. The president of the applicant corporation testified that in his opinion the McCook area is in need of additional facilities. He is an extensive grower and feeder of livestock. He testified that the number of cattle in the area had increased during the last few years, but the number sold in auction markets had decreased during the same period. Nine other growers and feeders testified to the need for an additional market. Signed petitions by 93 livestock growers and feeders desiring a second auction market were received in evidence. Protestants assert error on the part of the board in admitting these petitions into evidence. It is true that such petitions would not be admissible in a court of general jurisdiction. But here we are dealing with a hearing before an administrative board that is not bound by the strict rules of evidence. Chicago & N. W. Ry. Co. v. City of Norfolk, 157 Neb. 594, 60 N. W. 2d 662. While an administrative agency may relax the strict rules of evidence in affording a full and fair hearing, it must in every instance require any action taken by it to be supported by competent and relevant evidence. In the instant case, the present need for the facility as expressed by livestock growers and feeders is pertinent to the issue. The proof of numbers of such growers and feeders expressing such a need in addition to a reasonable number of witnesses on the subject appears to have some probative value. If petitions could not be used the record could be filled with repetitious and cumulative evidence. We find no error in the admission of the petitions even though they are not a controlling factor.

Protestants produced the evidence of 10 witnesses of which but two were livestock growers and feeders in the McCook community. Virtually all of these

witnesses were persons engaged in the operation of livestock auction markets. The evidence of these witnesses is to the effect that livestock growers and feeders were selling directly to meat packers and thereby reducing the number of livestock being sold through livestock auction markets. The evidence shows that approximately 3 years prior to the hearing there were two auction markets in McCook. One of them became involved in financial difficulties and was absorbed by the other. It is contended that this shows a want of need for a second auction market facility in McCook and that a second one can result only in economic loss to one or both. It is shown also that two auction markets will reduce the number of buyers attending each sale which has a depressive effect on sale prices. It is also asserted by the protestants that adequate competition is supplied by auction markets in neighboring and more distant cities and that the competitive factor is not therefore important to the grant of a license in the instant case. There is evidence that the existing auction market can handle all the business in the McCook area except on 2 or 3 days of each year. It is shown also that the existing facility has made improvements to improve its service and to increase its capacity.

As to whether or not a present need exists for the construction and operation of the new facility, the evidence is in conflict. This issue was peculiarly a matter for the board to determine. The finding of need for a new or additional service has adequate support in the evidence with which the courts may not properly interfere.

Complaint is also made of the finding that the proposed facility would be permanent and continuous. Protestants contend that the financial structure is a precarious one. But this is not the real issue. The question is, if the facility is constructed and put into operation, will it continue as a permanent business. Of course, neither the board nor anyone else can foretell with cer-

tainty the success of a new enterprise. It is the duty of the board to give reasonable consideration to the question as to whether or not the facility is a permanent one as distinguished from a temporary one. We think the board correctly found that, if the conditions precedent to beginning operations are met, the facility would be permanent and its operations continuous within the meaning of the statute.

A livestock auction market has sufficient public interest to be subject to public regulation under the police power. The statute, sections 54-1157 to 54-1186, R. S. Supp., 1965, requires that livestock auction markets be subjected to certain regulations in the public interest. It does not provide for a regulated monopoly as is sometimes provided in the case a street railway, nor does it require a certificate of convenience and necessity as in the case of railroad and trucking operations. The regulation of a livestock auction market is limited to the strict wording of the statute imposing the regulations, the purpose of such regulations being shown in a declaration of policy contained in the statute which states its purpose to be "to encourage, stimulate and stabilize the agricultural economy of the state in general, and the livestock economy in particular, by encouraging the construction, development and productive operation of livestock auction markets as key industries of the state and those markets' particular trade areas, with all benefits of fully open, free, competitive factors, in respect to sales and purchases of livestock." § 54-1157, R. S. Supp., 1965.

It is patent from an examination of the Nebraska Livestock Auction Market Development Act that its purpose was to require adequate service to the agricultural and livestock economy. It was not its purpose to establish a monopoly in existing livestock auction markets, nor, under the guise of regulation, to limit the number of livestock auction markets if the provisions of the statute are met. The operation of a livestock

auction market is a lawful business which any person has a right to pursue, subject to reasonable legislative regulation. Compliance with such lawful regulations maintains this fundamental right of which he may not be arbitrarily deprived. When the evidence of compliance with legislative regulations and the conditions for the issuance of a license supports the issuance of a license, even though such evidence thereon may be in direct conflict, the findings of the board must be sustained.

Protestants express concern about the financial structure of the applicant, of the want of experience of its incorporators in the livestock auction market field, and the asserted fear that the facility has no chance of success. But every person has the right to enter into any lawful business subject to reasonable and lawful legislative regulation when the public interest requires. A person has the same right to fail as he has to succeed. The incentive to enter legitimate fields of endeavor, taking his chances on gain or loss, is a basic right in our private enterprise system that should not be lightly disregarded. The statute recognizes that the benefits of free competition are to be preserved. The scope of the statute will not be extended beyond its express provisions and if its terms have been met and so found by the board on competent evidence, its findings will not be disturbed by the courts. The board specifically found that a livestock auction market at McCook, Nebraska, would beneficially serve the livestock economy of this state. This is the ultimate finding required by section 54-1163, R. S. Supp., 1965, for the issuance of a market license to the applicant. There being evidence to sustain the board's action in granting a license, even though opposed by credible evidence, its action is not arbitrary or capricious. Lewis v. City of Omaha, 153 Neb. 11, 43 N. W. 2d 419.

The board had jurisdiction to hear the application. There is evidence in the record to sustain the board in granting the license and its grant is not therefore arbi-

trary or capricious. The trial court was in error in holding that the evidence before the board did not sustain its action. The judgment of the district court is reversed and the cause remanded with directions to enter judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.