IN RE JOINT APPLICATION OF THE NEBRASKA PUBLIC POWER DISTRICT AND NORRIS PUBLIC POWER DISTRICT REQUESTING APPROVAL OF A JOINT APPLICATION OF WHOLESALE SERVICE AREA AGREEMENT NUMBER 3.

CITY OF LINCOLN, NEBRASKA, A MUNICIPAL CORPORATION, ET AL., APPELLANTS, V. NEBRASKA PUBLIC POWER DISTRICT ET AL., APPELLEES.

216 N. W. 2d 722

Filed March 28, 1974. No. 39220.

Ginsburg, Rosenberg, Ginsburg & Krivosha, for appellants.

Barlow, Watson & Johnson and Crosby, Guenzel, Davis, Kessner & Kuester, for appellees.

Mattson, Ricketts, Davies, Stewart & Calkins, for amicus curiae.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, and CLINTON, JJ., and HASTINGS, District Judge.

CLINTON, J.

This is an appeal from an action of the Nebraska Power Review Board approving upon the joint application of the Nebraska Public Power District and Norris Public Power District an agreement between the two districts limiting the areas in which and the present and future customers to whom the respective districts would furnish electrical energy at wholesale. The agreement was entered into pursuant to the provisions of Laws 1971, L.B. 349, now sections 70-1002.01, 70-1002.02, 70-626.01, and 70-1001, R. R. S. 1943. At the hearing before the board the City of Lincoln, the City of Fairbury, and the City of Crete made appearances, cross-examined witnesses for the applicants, and presented evidence on their own behalf. At the conclusion of the hearing the board approved the agreement and the three named municipalities each appealed.

Under the terms of the agreement Nebraska promised to limit its wholesale service in Lancaster, Gage, Saline, Jefferson, and Thayer Counties to 31 specifically named municipal electric systems which include the three appellants. Norris agreed to limit its service to the named counties excluding the specifically named municipalities.

Each of the three municipalities owns and operates its own electrical generating and distribution system. The City of Lincoln presently purchases part of its energy from Nebraska and sells energy to Nebraska under agreements for exchange of power. Fairbury generates its own power and also purchases power from the Bureau of Reclamation. Crete generates its own power and presently purchases from neither of the districts. The municipalities object to approval of the agreement because they do not want to become "captive customers" and desire to preserve their option in the future to negotiate with either district for power. Norris as well as Nebraska has the capacity for serving all three municipalities either directly or through their statutory rights of interconnection and wheeling.

Four issues are presented on this appeal: (1) Whether L.B. 349 is unconstitutional and void because it violates Article X, section 3, of the Nebraska Constitution, and whether it is contrary to the public policy of Nebraska as expressed in other statutes. (2) Whether L.B. 349 is absolutely void because of inherent and irreconcilable conflicts in the statute. (3) Whether L.B. 349 is unconstitutional and void because it delegates legislative power to an administrative body without designating adequate standards governing the delegation. (4) The sufficiency of the evidence to sustain the findings of the board that the statutory criteria for approval of the agreement were met.

We hold the statutes constitutional and affirm the finding of the board.

L.B. 349 provides as follows: "All suppliers of electricity, including public power districts, public power and irrigation districts, municipalities, electric membership associations, and cooperatives, shall have authority to enter into written agreements with each other limiting the areas in which or the customers to which a party to the agreement shall provide or sell electric

energy at wholesale. Wholesale electric energy is hereby defined as electric energy which is sold to another agency for resale to the ultimate user, hereafter referred to as the retail customer. Before such agreements shall become effective, they shall be submitted to and approved by the Nebraska Power Review Board created by section 70-1003. It is declared to be the purpose of this section to promote and encourage the making of such agreements. Such agreements may be amended by the parties thereto at any time, and such amendments shall require the approval of the Nebraska Power Review Board. When requested to approve such an agreement or amendment thereto, the Nebraska Power Review Board shall consider whether or not the proposed agreement or amendment can be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the area covered by the agreement. It may make such investigation as it determines is necessary and hold a hearing if it determines one to be desirable. At the conclusion of its investigation, the Nebraska Power Review Board shall approve the agreement or amendment unless it determines that it cannot be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the area covered. Such agreements when approved by the Nebraska Power Review Board shall not be binding upon other suppliers that are not parties to the agreement and the Nebraska Power Review Board shall have no authority to impose conditions that will be binding or applicable to other suppliers that are not parties to such agreements. Such agreements shall not be considered as establishing service areas within the meaning of Chapter 70, article 10." § 70-1002.01, R. R. S. 1943.

"No supplier shall offer, provide or sell electric energy at wholesale in areas or to customers in violation of any agreement entered into and approved by the Nebraska

Power Review Board pursuant to section 70-1002.01." § 70-1002.02, R. R. S. 1943.

Section 3 of the act amended section ·70-626.01, R. S. Supp., 1969, which previous to its amendment required: ". . . public power district[s] . . . to sell electrical energy [to municipalities] at wholesale." The amendment placed limitations on this mandatory direction by providing: "if such sale is not in violation of an agreement of the generating power agency approved by the Nebraska Power Review Board."

Section 4 of the bill amended section 70-1001, R. R. S. 1943, by extending the policy of the act to "wholesale" as well as retail sales of electrical energy.

We treat the issues in the order in which we have listed them. (1) Article X, section 3, of the Constitution of Nebraska, provides in part as follows: "The Legislature may by law require all public utilities and common carriers to exchange business through physical connections, joint use, connected service, or otherwise." The appellants' argument for unconstitutionality based on the above provision is somewhat abstruse in that they combine it with contentions that L.B. 349 is contrary to public policy because section 70-1001, R. R. S. 1943, establishes a policy of "adequate electric service at as low overall cost as possible," which they claim L.B. 349 will defeat because it eliminates competition; that the act impinges on other sections of the statute which require interconnection, wheeling, and sale of surplus power; and that the agreement itself is void because it creates a monopoly contrary to public policy.

We find the appellants' position is not well taken for two reasons: (a) The constitutional provision in question is couched in permissive language. It authorizes the Legislature to act, but does not compel it. (b) The interwoven arguments founded upon alleged conflicting statements of public policy, policies against monopoly, and ambiguities concerning which no issue presently

exists may all be answered by the following principles. Public policy in matters within the legislative domain is for the Legislature to determine. City of O'Neill v. Consumers Public Power Dist., 179 Neb. 773, 140 N. W. 2d 644. If legislation violates no constitutional provision this court has no authority to determine its wisdom. State ex rel. Meyer v. County of Lancaster, 173 Neb. 195, 113 N. W. 2d 63.

(2) The appellants assert there are direct conflicts between the provisions of sections 1 and 2 of L.B. 349 which are not susceptible of resolution by construction and therefore the statute is void. They point to the provision of section 1 which states that the agreement between the suppliers to limit territory and customers shall not be binding upon other suppliers which are not parties to the agreement. It is claimed this conflicts with section 2 which says: "No supplier shall offer, provide or sell electric energy at wholesale in areas or to customers in violation of any agreement entered into and approved by the Nebraska Power Review Board pursuant to section 1 of this act (now § 70-1002.01)."

We do not believe there is any irreconcilable conflict between the two sections. It seems fairly apparent to us that the supplier referred to in section 2 is one who is a party to the agreement. One who is not a party to an agreement simply cannot violate it. The legislative discussion during the consideration of the bill confirms our construction. In construing a legislative act, if more than one reasonable construction is possible, that construction which sustains legislation will be adopted. Bodenstedt v. Rickers, 189 Neb. 407, 203 N. W. 2d 110.

(3) Appellants contend the statute is unconstitutional because it delegates legislative power to the board without providing for sufficiently clear standards to guide the exercise of the power. The substance of the pertinent portion of the statute in question is the following:

"Board shall consider whether or not the proposed agreement or amendment can be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the area." § 70-1002.01, R. R. S. 1943. Appellants argue that the term "reasonable cost" does not supply a reasonable guideline and an understandable fact standard. They make no similar contention with reference to the standard of providing "a reliable" power supply. Appellants further contend the statute directs and authorizes the board to approve such agreements in the absence of any evidence supporting a factual finding on "reasonable cost."

We do not construe the statute as authorizing the board to act in the absence of any evidence to support a finding that the statutory criteria of reliability of supply and reasonableness of cost have been met. The statute, section 70-1002.01, R. R. S. 1943, directs what the board shall consider when asked to approve such an agreement, namely, reliability of supply and reasonableness of cost. It may make "such investigation *as it determines is necessary.*" It may hold a public hearing. "At the conclusion of its investigation," it shall approve "unless it determines that it cannot be reasonably expected" to provide a reliable supply at reasonable cost. The foregoing provision contemplates, in our view, that the board will not approve an agreement in the absence of some evidence either gathered as a result of its own investigation or produced at a public hearing, which evidence will enable it to find affirmatively that the criteria are met.

There is another reason why it is clear the Legislature intended that the board must have evidence before it can act. The statute provides for an appeal to this court "in the same manner as appeals are taken from decisions of the State Railway Commission." § 70-1016, R. R. S. 1943. If there is no evidence before this court on appeal there would be no way for us to

carry out our duty to determine whether the requirements of the controlling statute have been followed and whether substantial evidence supports the finding.' If this court were by the statute required to make a determination either in the absence of evidence or de novo on the record that would obviously constitute a clear and unconstitutional invasion of the legislative domain. City of Auburn v. Eastern Nebraska Public Power Dist., 179 Neb. 439, 138 N. W. 2d 629; Cornhusker P. P. Dist. v. Loup River P. P. Dist., 184 Neb. 789, 172 N. W. 2d 235; City of Schuyler v. Cornhusker P. P. Dist., 181 Neb. 704, 150 N. W. 2d 588; Williams v. County of Buffalo, 181 Neb. 233, 147 N. W. 2d 776; Keller v. Potomac Electric Power Co., 261 U. S. 428, 43 S. Ct. 445, 67 L. Ed. 731. We cannot construe the statute in such a way as to attribute to the Legislature an intent to make a delegation of legislative power to this court. The language of the statute does not support any such construction.

We accordingly construe the statute to require that before the board can make the factual determinations required it must have before it evidence produced by its own investigations or otherwise that will support its fact findings.

Is the criteria of "reasonable cost" a sufficiently definite standard? In 1 Am. Jur. 2d, Administrative Law, § 118, p. 926, we find the following statement: "The policy of the lawmaking body and the standards to guide the administrative agency may be laid down in very broad and general terms which get precision from the technical knowledge or sense and experience of men and thereby become reasonably certain. The purpose of the statute, the requirements it imposes, and the context of a particular provision may show that the broad standard it establishes does not require a construction as comprehensive as the words alone permit and is not so vague and indefinite as to amount to a complete

absence of a standard." It is to be borne in mind in this case that the term "reasonable cost" refers to a determination of the reasonableness of charges for electrical energy, in other words, the reasonableness of utility rates. There are well-established general principles as to the manner in which such determinations are made. 73 C. J. S., Public Utilities, § 13, p. 1008, § 17, p. 1013, § 25, p. 1032; 1 Priest, Principles of Public Utility Regulation, pp. 45, 139.

The Legislature has heretofore delegated to administrative bodies the duty of determining "feasibility" of formation of public power districts and this court has approved the sufficiency of such a standard. State ex rel. Wright v. Lancaster County Rural P. P. Dist., 130 Neb. 677, 266 N. W. 591. In the present context the words "reasonable cost" acquire certainty from the "technical knowledge or sense and experience of men." It may be that one element of cost of service, namely, return on rate base, may be determined somewhat differently in the case of a utility which is a creature of the Legislature than in the case of one which has stockholders to whom a return must be made. That difference, if it exists, would no doubt lie in the purpose for which the Legislature authorized creation of the utility and in the Legislature's policy statement as to rates. That question, of course, is not before us in this case, but we mention it simply because such a difference would not, in our opinion, make the standard of "reasonable cost" uncertain. It would merely require a somewhat different determination on one element of the cost of service. We hold that the statutory provision requiring determination by the board of whether the "proposed agreement or amendment can be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the area." is a sufficiently definite standard to guide the board in the exercise of the delegated legislative power of determining the

facts on which approval of agreements under L.B. 349 are to be founded. We would point out that the power here delegated is not a rule or regulation-making power, but is solely a delegation of power to determine facts upon which the exercise of a proprietary function of a subdivision of government depends. It appears to us entirely reasonable that in such cases a less strict standard than in the case of delegation of power to make rules or regulations is constitutionally acceptable.

(4) Does the evidence support the findings of the board that the agreement will provide the affected customers and area with "a reliable wholesale power supply at a reasonable cost"?

The board in this case did not make an investigation of its own, nor introduce any evidence into the record, nor take judicial notice of any fact. The evidence was introduced by the two districts which were parties to the agreement. The deputy general manager of Nebraska testified. He is an electrical engineer by profession and had been employed by Nebraska for 24 years in a number of capacities. He described in considerable detail the utility systems involved, including planned construction, and introduced supporting documentary evidence. He described the arrangements with various customers and potential customers and their energy sources, and gave as his own conclusion that reliable service would be supplied under the agreement.

He testified that Nebraska's rates are "a cost of service rate. In other words, the rate structure is so designed that it returns the full cost of the operating of the District." He then rendered his opinion that the "area covered by this agreement can be provided reliable wholesale power at a reasonable cost."

Representatives of the appellants, operating personnel rather than counsel, then cross-examined the witness. The cross-examination was, for the most part, directed to matters other than the question of "reasonable cost."

Insofar as it was directed to rates, it brought out the fact that there were variables which affected rates dependent upon conditions of service. Redirect examination established that such variances were related to the cost of service under particular conditions. On cross-examination by the board of this witness, some details of determination of cost of service were brought out.

The general manager of Norris testified. He had been the manager of the district since 1947. He stated that he had heard the Nebraska manager's testimony and agreed with it. He had taken part in the negotiations for the agreement. He then testified without further foundation: "Q In your opinion, Mr. Trussell, can the Norris District be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the wholesale service areas assigned to it in the application that is being heard? A Yes, it can. Q And, in your opinion, can Nebraska District be reasonably expected to provide a reliable wholesale power supply at a reasonable cost for the areas assigned to it in this Wholesale Service Area Agreement? A Yes." Cross-examination of this witness did not relate to the question of reasonableness of cost nor the foundation for his opinion testimony.

Statements were then made by representatives of the three municipalities. The primary thrust of the statements was that they objected to the agreement solely because it prevented them from buying from Norris in the future should they ever desire to do so. One of these representatives had particular objection to an element in the rate structure in Nebraska referred to as the "blend eliminator." One of these representatives testified that he was familiar with the Nebraska rate structure but not that of Norris. They introduced no evidence to contradict the conclusions of the witnesses for Nebraska and Norris.

This is a contested case within the meaning of Chapter

84, article 9, R. R. S. 1943, which prescribes rules for administrative agencies. See § 84-901(3), R. R. S. 1943. Section 84-914, R. R. S. 1943, provides in part that in contested cases: "(1) An agency may admit and give probative effect to evidence which possesses probative value commonly accepted by reasonably prudent men in the conduct of their affairs. It shall give effect to the rules of privilege recognized by law. It may exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence; Provided, that any party to a formal hearing before such agency, from which a decision may be appealed to the courts of this state, may request that such agency be bound by the rules of evidence applicable in district court by delivering to such agency at least three days prior to the holding of such hearing a written request therefor . . . ." This section further provides: "(4) Every party shall have the right of cross-examination of witnesses who testify and shall have the right to submit rebuttal evidence. (5) . . . An agency may utilize its experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to it."

Although the opinion testimony of the two witnesses for the contracting parties, especially that of the Norris representative, was minimal on foundation, we cannot say that it was as a matter of law without probative value within the meaning of section 84-914, R. R. S. 1943. It is clear that the two witnesses for the parties were qualified by training and experience to give their expert opinions. It is further clear that their opinions were based on facts within their own knowledge. This is usually sufficient to permit the admission of the opinion. Mathine v. Kansas-Nebraska Nat. Gas Co., Inc., 189 Neb. 247, 202 N. W. 2d 191. The record makes it clear that the appellants did not at the hearing intend to challenge the conclusions of the witnesses for the contracting parties.

· The League of Nebraska Municipalities has filed a brief amicus curiae in this case. That brief, as do those of the appellants, makes strong arguments attacking the wisdom of making municipalities "captive customers" of one power district rather than giving them the option if they wish to bargain with both. The power of the Legislature is plenary. As against the state the districts cannot invoke either the contract clause or the Fourteenth Amendment to the Constitution of the United States. City of O'Neill v. Consumers Public Power Dist., *supra;* City of Trenton v. New Jersey, 262 U. S. 182, 43 S. Ct. 534, 67 L. Ed. 937, 29 A. L. R. 1471. The Legislature may any time it wishes undo what the districts have done and which has been approved by the board. The arguments must be directed to the Legislature and not to this court.

AFFIRMED.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion herein because I am convinced that a fair appraisal of the situation reveals the sole purpose of the agreement between Norris Public Power District and Nebraska Public Power District is to limit competition and institute a captive market. Such application of our statutes is contrary to public policy.

Section 70-625.02, R. R. S. 1943, states: "It is declared to be the policy of the State of Nebraska that electric transmission facilities and interconnections which are defined as being electric lines having a rating of thirty-four thousand five hundred volts and higher will be provided and made available to all power agencies so as to result in the lowest possible cost for the transmission and delivery of electric energy over the transmission and interconnected facilities of any public power district, public power and irrigation district, municipality, governmental subdivision, or nonprofit electric cooperative corporation."

It certainly cannot be said that the above-declared policy of the State of Nebraska is being effectuated by limiting a municipality's access to a source of power through a wholesale sale agreement. It is patently apparent an opposite result is being achieved.

Section 70-1001, R. R. S. 1943, provides in part: "* * * it is the policy of this state to avoid and eliminate conflict and competition * * * in furnishing electric energy to retail and wholesale customers, to avoid and eliminate the duplication of facilities and resources which result therefrom, and to facilitate the settlement of rate disputes between suppliers of electricity." This should obviously be interpreted as follows: "* * * it is the policy of this state to avoid and eliminate conflict and competition * * * (in order) to avoid and eliminate duplication of facilities and resources which result therefrom, and (in order) to facilitate the settlement of rate disputes * * *."

That is, the purpose of these statutes is not to avoid conflict in competition per se, but rather to avoid those particular sorts of conflict and competition which cause costly and unnecessary duplication of facilities and impede the settlement of rate disputes.

In order for any particular application of these statutes to accord with the public policy, it is necessary that such application conform to the purpose of these statutes outlined above. The public policy which serves as the underpinning for such anti-competition agreements is very limited. It is a carefully defined exception to the rule that agreements which limit competition are normally contrary to public policy. Obviously it follows that an application of these statutes which serves to destroy the normal competitive market system, while not furthering the announced purposes of these statutes, is void as contrary to our public policy. In most instances the general public is being adequately served before the implementation of the limiting agree-

ment.  Consequently, the agreement is not serving the interest of the general public but rather that of the power companies.

A limiting agreement of this sort cannot be held to further the purposes declared by our Legislature unless there is evidence indicating that retention of the present form of service will result in costly and unnecessary duplication of facilities or impede settlement of rate disputes.  In this case, the evidence is definitely otherwise.  Diversity of sources, an ability to shop around, so to speak, becomes important to a municipality operating its own facility.  Only by matching its particular consumption pattern with that of several suppliers can it be assured of the lowest possible cost per unit of power purchased.  It is apparent that as each competing source of supply is eliminated the municipality faces a much more difficult task in minimizing the cost of electrical energy to its retail customers.

It is here argued that wholesale agreements actually hold down costs.  This definitely is not true in the present situation.  In Crete for example, Norris is not allowed to sell to, or buy from, the city even though its lines are already close by, and actually interconnected into the city through the NPPD system.  These lines are a necessary length in the power grid rather than a duplication of facilities, and will be utilized whether Crete is able to purchase from Norris or not.  It makes little sense to say there is a saving of money when the necessary facilities for purchasing a district's power are already in existence and are maintained by the district.  It should be noted that this situation is not only common to the city of Crete, but is also found in many other municipalities throughout the state.

Many of the evils that led to the passage of antitrust legislation are present where public power districts have agreed to divide their service areas.  Trade area agreements rarely have any purpose other than to suppress

competition and correspondingly increase costs. Through such an agreement a public supplier acquires monopolistic power and is able to manipulate rates while at the same time dictating terms of sale.

I cannot agree with the majority opinion that there is evidence sufficient to sustain a finding that wholesale power can be supplied to the area at a reasonable cost. Representatives of both districts simply testified by way of conclusion that such would be the case. No sufficient showing was made to sustain that conclusion. The evidence offered in opposition was to the effect that the rates were different, and therefore would have an adverse or different effect, depending upon who the supplier was.

While it is true that an administrative agency can forego some of the stringencies of the rules of evidence, it is not true that it can entirely ignore them when the approval of the agreement is dependent upon a specific finding, and the parties fail to produce evidence to sustain that finding. In Midwest L. C. Co. v. Tri-State L. C. Co. (1967), 182 Neb. 41, 151 N. W. 2d 908, we said: "While an administrative agency may relax the strict rules of evidence in affording a full and fair hearing, it must in every instance require any action taken by it to be supported by competent and relevant evidence."

In City of Schuyler v. Cornhusker P. P. Dist. (1967), 181 Neb. 704, 150 N. W. 2d 588, we held: "An order of the Nebraska Public Power Review Board which is not sustained by the evidence will be reversed." See, also, Cornhusker P. P. Dist. v. Loup River P. P. Dist. (1969), 184 Neb. 789, 172 N. W. 2d 235.