NEBRASKA PUBLIC POWER DISTRICT, A PUBLIC
CORPORATION, APPELLANT, V. CITY OF YORK, A
MUNICIPAL CORPORATION, APPELLEE.
326 N.W.2d 22

Filed November 5, 1982.   No. 44362.

Barlow, Johnson, DeMars & Flodman, for appellant.

Mattson, Ricketts, Davies, Stewart, Calkins & Duxbury, and Louis Michael Thrasher and Joseph W. Grant, and Wallace W. Angle, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ.

PER CURIAM.

This is an appeal from a judgment of the District Court for York County, Nebraska, in an action brought by the appellant, Nebraska Public Power District, a public corporation (hereinafter NPPD), against the City of York, appellee, for a declaratory judgment under the provisions of Neb. Rev. Stat. § 70-650.01 (Reissue 1981). The purpose of the action is to determine whether two electrical substations are a part of the "distribution system, as distinguished from its [the utility's] . . . transmission lines" within the City of York and thus required to be conveyed to the City of York without cost as provided by the provisions of § 70-650.01. The District Court found that the substations, except the high voltage buses thereon, were a part of the distribution system within the territorial limits of the City of York, and quieted title in the City of York to the substations, including the real estate on which they sit.

Section 70-650.01 provides in part: "Except as provided in sections 70-1101 to 70-1106, whenever any public power district or public power and irrigation district shall have acquired, by purchase, lease or otherwise, any electric distribution system, or any part or parts thereof, situated within or partly within any city or village, and such district shall have fully

paid and redeemed, or have accumulated reserves sufficient for the redemption of, all of the bonds or other obligations of the district evidencing the indebtedness incurred as the cost of construction or the purchase price of its lines, works and system, then and in that event, whenever any such city or village shall so request, the said district shall convey without cost all of its right, title and interest in and to its electric distribution system, as distinguished from its generating plants and transmission lines, to the said city or village within the territorial limits of which such system is located. . . . In the absence of an agreement between any city or village and the public power district, the city or village may at any time determine what shall be included in the term distribution system by a declaratory judgment in which the public power district or public power and irrigation district owning the distribution system shall be joined.''

A recitation of some background facts and statutory history is useful to an understanding of the factual context under which this dispute arises. In 1941 Iowa-Nebraska Light and Power Company owned certain electrical properties within the City of York, including a generation plant, electric transmission lines, and a distribution system. In that year Consumers Public Power District, the predecessor of NPPD, acquired all of these facilities from Iowa-Nebraska. Consumers and NPPD were both public corporations, subdivisions of government created pursuant to legislative authority. Neb. Rev. Stat. § 70-602 (Reissue 1981).

In 1945 the Legislature enacted the statute which is the predecessor of § 70-650.01. 1945 Neb. Laws, Ch. 161, § 2, p. 525. An earlier version of the statute was contained in 1939 Neb. Laws, Ch. 88, § 1, p. 382. It provided that the municipality could acquire the electrical ''distribution system'' located within the municipality by paying a fair and reasonable price.

If the price could not be agreed upon, sale could be compelled by the exercise of the right of eminent domain under the provisions of Comp. Stat. §§ 19-701 to 19-706 (1929) as then written. The 1945 law provided that when the condemnation board, created by Neb. Rev. Stat. Ch. 19, art. 7, had determined the fair and reasonable price, it should "deduct therefrom and allow as a credit upon such sum an amount that bears the same proportion to such sum as the amount of the bonds that have been paid, redeemed or liquidated, and the reserves established therefor by said district, out of the earnings from the operation of the district while such city or village was within and a part of such district, bears to the total amount of the bonded indebtedness of such district issued to finance the purchase price and the cost of construction of the entire property of such district." 1945 Neb. Laws, Ch. 161, § 1, p. 525. In 1945 the Legislature added the provision requiring conveyance upon request without cost after the district had paid for the bonds or accumulated reserves sufficient to redeem the bonds.

In 1963 the Legislature added to § 70-650.01 the provision providing for a declaratory judgment action to determine what was included in the distribution system if the public power district and the municipality could not agree.

The acquisition of the York electrical system by Consumers was financed by issuance of 30-year revenue bonds which were paid by the end of 1971. The City of York requested transfer to it of the distribution system pursuant to the provisions of the statute. To implement the transfer, NPPD and York entered into a contract denominated "YORK MUNICIPAL DISTRIBUTION SYSTEM AGREEMENT WITH PROPERTY PURCHASE AGREEMENT, DISTRIBUTION SYSTEM LEASE, AND WHOLESALE POWER CONTRACT." This agreement provided for the transfer of the distribution

system to York by bill of sale. To the principal agreement was appended and incorporated a lease and wholesale power contract. By the lease York let to NPPD the distribution system for a period of 15 years, with a provision of automatic extension for an additional 10-year period absent notification by York 180 days before expiration. For the lease York was to receive an annual rental of 10 percent of the adjusted retail revenues. The lease required the district to maintain the system and pay the cost of any additional construction. The wholesale power contract provision of the agreement provided that upon termination of the lease the municipality would purchase wholesale energy from NPPD for a period of 25 years.

The principal agreement provided: "5. The District will prior to January 1, 1977, initiate court action to determine whether stepdown substations such as the 34.5 to 4.16 KV substations in York are included in the term 'Distribution System' as used in said Section 70-650.01. In the event that a final court interpretation determines that such substations are within the term 'Distribution System,' this Agreement shall be altered to conform to said final court interpretation. In the event that a final court interpretation determines that such substations are not within the term 'Distribution System,' the Municipality shall have no obligation during the term of the Distribution System Lease with reference to the use of said substations." The two substations which are involved in this litigation are referred to in the evidence as the Platte Avenue and the Delaware Avenue substations.

Briefly summarized and in somewhat oversimplified form, the arguments of the parties supporting their respective positions are these. NPPD contends that the character of a facility as transmission or distribution ought to be determined by the function which it performs. It points out that it is undis-

puted that the electrical power, until it leaves the transformer at the substation, is at transmission voltages; a substation up to that point serves a function as part of the transmission system rather than the distribution system. It also relies upon a definition of distribution system contained in a publication by The Institute of Electrical and Electronics Engineers, Inc., entitled Standard Definitions in Power Operations Terminology. That definition is as follows: *"distribution system*. That portion of an electric system which delivers electric energy from transformation points on the transmission, or bulk power system to the consumers." (Emphasis supplied.)

York relies upon a definition prescribed by the Federal Power Commission contained in its regulations related to Uniform Systems of Accounts. That definition is as follows: "B. 'Distribution system' means all land, structures, conversion equipment, lines, line transformers, and other facilities employed between the primary source of supply (i.e., generating station, or point of receipt in the case of purchased power) and of *delivery to customers,* which are not includible in transmission system, as defined in paragraph A, *whether or not such land, structures, and facilities are operated as part of a transmission system or as part of a distribution system.*

*"Note*: Stations which change electricity from transmission to distribution voltage shall be classified as distribution stations." (Emphasis supplied.)

Paragraph A referred to in the above definition is as follows: "A. 'Transmission system' means:

"(1) All land, conversion structures, and equipment employed at a primary source of supply (i.e., generating station, or point of receipt in the case of purchased power) to change the voltage or frequency of electricity for the purpose of its more efficient or convenient transmission;

"(2) All land, structures, lines, switching and conversion stations, high tension apparatus, and their control and protective equipment between a generating or receiving point *and the entrance to a distribution center or wholesale point*; and

"(3) All lines and equipment whose primary purpose is to augment, integrate or tie together the sources of power supply." (Emphasis supplied.)

These same regulations also provide: "C. Where poles or towers support both transmission and distribution conductors, the poles, towers, anchors, guys, and rights of way shall be classified as transmission system. The conductors, crossarms, braces, grounds, tiewire, insulators, etc., shall be classified as transmission or distribution facilities, according to the purpose for which used.

"D. Where underground conduit contains both transmission and distribution conductors, the underground conduit and right of way shall be classified as distribution system. The conductors shall be classified as transmission or distribution facilities according to the purpose for which used."

York, of course, relies on the portion of B designated "Note." NPPD in response points out that the Federal Power Commission definitions are for accounting purposes only and, in any event, do not apply to NPPD since it is not subject to the control of the Federal Power Commission.

Each party produced testimony by expert witnesses who, as might be expected, gave their contradictory expert conclusions. NPPD's expert testified that both substations, with the "exception of the low voltage distribution protective equipment[,] would be a part of the transmission" system. His opinion was based on the function of the station and The Institute of Electrical and Electronics Engineers definition previously mentioned. One of York's experts gave his opinion that the substations were required to be classified as "distribution substations." The

basis of the opinion was the Federal Power Commission definitions and his past experience. York's second expert had been retained to make a report for York to assist it in defining the distribution system. In that report he had classified the two substations as distribution substations. His opinion was that the substations had nothing to do with transmission. Part of the basis of his opinion was the classification of substations for accounting purposes.

Apart from these "conclusions" of the experts, no significant conflict exists in the evidence. We can, therefore, attempt to describe in as simple terms as a layman can the nature and function of electrical systems and their respective parts without any consideration of conflicting testimony. A complete electrical system consists of generation facilities, transmission facilities, and distribution facilities. Generation facilities are those related to producing electrical energy. Transmission facilities are those related to moving the electricity at various high voltages from the source of generation to the distribution system, the latter being the part related to delivery to the ultimate consumer. The evidence shows that voltages of 34.5 kV, or 34,500 volts, and higher are considered transmission voltages. Transmission voltages vary, and the purpose for such variations is efficiency in transmission. Substations may be either part of the transmission system or of the distribution system. Substations may be used either to increase voltage or to reduce voltage, or both, depending upon their construction and purpose. Substations which increase voltage are called "stepup" stations; substations which decrease voltage are "stepdown" stations. Both of the substations here involved are now "stepdown" stations. At one time, when a steam and diesel generation plant was located in York, one of the stations, the Platte Avenue substation, was also a "stepup" station which increased the voltage of surplus power

for transmission and sale to other municipalities.

Transmission voltages must be reduced before they can be used by the ultimate consumer. Part of this reduction takes place in the substation. The final reduction to 120 and 240 volts takes place in line transformers located on the distribution lines. The two substations here involved receive the electrical energy at a voltage of 34.5 kV and reduce it to 4.16 kV, or other distribution voltage. These voltage reductions take place in the substation transformers, which are electrical windings located within tank-like containers.

Pictures of the two substations were introduced in evidence and were explained by witnesses. An explanation of some parts of the substations and the function of the parts is useful. They differ somewhat in their construction, but since they are essentially the same, a description of one will suffice. Part of the equipment is mounted on a structure of metal poles and girders. Three 34.5 kV transmission lines (wires) enter the substation at each end. These are connected to a high voltage bus by insulators and switches mounted on the structure. The bus is simply a part of the transmission line and is made of inflexible, or rigid, material (either copper or aluminum), as distinguished from the flexible wire of which ordinary transmission line is constructed. The switches, apparently remotely controlled, permit electrical current to flow in from either end and out the other. However, in normal operations the set of switches at one end will be open and the other closed. Connected to the high voltage bus are other buses which lead down through various protective switches and fuses and enter the transformers. The transformers are not mounted on the superstructure but sit on a concrete base. The electrical current enters the transformer at what is called a high voltage bushing at a voltage of 34.5 kV and leaves at another connection at 4.16 kV.

The purpose of the fuses previously mentioned is to protect the system if there is an internal failure of the transformer. When the current leaves the transformer at 4.16 kV, it enters, by various connections, a device called a low voltage switch gear, which is a protective switch designed to disconnect the distribution lines from the transformer in case of fault in the distribution lines. The portion of the substation above (functionally, not physically) the point where the 34.5 kV current enters the transformer is referred to as the high voltage side. The portion after it leaves the transformers is referred to as the low voltage side.

The trial court, in a memorandum opinion preceding the journalization of its order, stated: "It makes almost perfect sense to define a transmission system according to function and operation, i.e. the system ends when electricity is transformed to distribution voltage. It makes something less than perfect sense, but good sense," to say "transmission ends at a point when electricity is no longer carried to two or more distributors." The court then stated that, in its view, both of the above arguments miss the point, and ventured the opinion that in 1945, when the Legislature decided that municipalities should have the option to acquire distribution systems, "the legislature had reasons for so doing. The 1963 legislature did not change anything by their direction to take definitive arguments to Court [obviously referring to the declaratory judgment provision]. Those 1945 reasons are the exact same reasons that the legislature could not have intended that substations located within York and almost solely serving York should be without the distribution system and excluded from the control of the city."

At this point we must raise a question which the parties have not discussed in their briefs. If the 1963 provision for a declaratory judgment action was intended by the Legislature to give the courts the

power to supply a definition of "distribution system," then the provision would clearly be unconstitutional, for it would be entrusting to the courts a legislative function contrary to the provisions of Neb. Const. art. II, § 1, which provides in part: "[N]o person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted."

In general, except as restricted by the Constitution, it is the function of the Legislature by the enactment of statutes to declare what the law is. 16 C.J.S. *Constitutional Law* § 106 (1956). If, for example, the Legislature wished to say that stations which change electricity from transmission voltage to distribution voltage shall be part of the distribution system, whether operated as part of the transmission system or not, then it was perfectly free to do so. It could not, however, thrust that legislative function upon the courts. The Legislature may not delegate to the courts legislative power. *Searle v. Yensen,* 118 Neb. 835, 226 N.W. 464 (1929). Questions of public policy related to the powers of and government of public power districts are, in the first instance, a purely legislative cognizance and may not be referred to the courts for determination. *Searle v. Yensen, supra.* The Legislature may, however, vest in the courts factfinding questions to determine whether or not a law has been complied with. *Searle v. Yensen, supra.*

The evidence in this case indicates that substations (even the Federal Power Commission definition we have quoted recognizes that fact) may be operated as either part of the transmission system or as part of the distribution system. The legislative history recognizes that this is the case. The sponsor of the 1963 changes, after talking to representatives of the public power districts, attorneys, the Attorney General, and the bill drafter concerning the term

"distribution system," said: "[T]here is just no way in which you can spell out any plainer what that means. I think they are a collective opinion that the only way you can do it is to inaugurate a court action in the district court for the court to determine with the facts before it, what is the distribution system, and it could differ in each specific community." Floor Debate, Committee on Public Works, L.B. 410, 73d Leg. 1575-76 (May 13, 1963). The Encyclopaedia Britannica notes: "As systems were interconnected, the transmission circuits of the original system became the distribution circuits of the combined system. Thus, the distinction between distribution and transmission circuits has become vague. It may be said, however, that transmission implies larger blocks of power delivered at higher voltages to a few main substations, while distribution implies smaller blocks of power delivered at lower voltages to many smaller substations *or to consumers.*" (Emphasis supplied.) 8 Encyclopaedia Britannica *Electric Power,* at 216 (1968).

If we were to construe the declaratory judgment provision of § 70-650.01 as delegating to the courts the power of selecting either of the definitions we have earlier mentioned, or any other definition, if there are other definitions, then we would necessarily have to declare that provision of the statute void as being unconstitutional. Where a statute is susceptible of two constructions, under one of which the statute is valid while under the other it is unconstitutional or of doubtful validity, that construction which gives it validity should be adopted. *Union Stock Yards Co. v. Nebraska State Railway Commission,* 103 Neb. 224, 170 N.W. 908, 172 N.W. 528 (1919); *Starman v. Shirley,* 162 Neb. 613, 76 N.W.2d 749 (1956).

The evidence shows that stepdown substations such as those here involved may be operated as either part of the transmission system or the distri-

bution system. The legislative history clearly shows that the Legislature recognized that fact. It placed upon the courts the obligation to determine the facts in a particular case, otherwise it could have adopted an arbitrary definition, such as that in the Federal Power Commission's regulations, applicable to all cases.

Thus, the posture of this appeal is that of deciding whether the trial court was clearly wrong in its determination. We observe, first, that the trial court obviously felt that it was deciding a question of law, for it found that it was the intention of the Legislature in 1945 to give the "distribution system" to the municipality. It is, of course, apparent that was its intention. However, the finding of such intent does not resolve the factual issue and really begs the question, i.e., is the substation part of the transmission system or of the distribution system. The same fault may be found in the conclusions of the expert witnesses insofar as they rely upon arbitrary definitions rather than the operation and function of the substation.

It is undisputed that the high voltage bus mounted on the substation superstructure and the switches and productive devices directly attached thereto are part of the transmission system. It is clear that until the current reaches the substation transformer it is at transmission voltage. The purpose of the transformation is to reduce the voltage to a level which may be carried on distribution lines. This occurs only when the electricity leaves the transformer on the low voltage side.

Certain provisions of the wholesale power contract entered into between the parties are significant. Those provisions are:

"ARTICLE III

"CHARACTER OF SERVICE AND POINT OF DELIVERY

"The character of electric service to be furnished

hereunder shall be three phase alternating current at a frequency of approximately 60 hertz and at a nominal voltage of 4160 wye volts.

"The 'Points of Delivery' for said electric service shall be west side of Delaware Avenue between 17th and 18th Streets and west side of Platte Avenue between West 6th and 7th Streets.

"ARTICLE IV

"FACILITIES TO BE PROVIDED

"The District will furnish, install, and maintain, at its own expense, all equipment and facilities necessary for connecting its electric lines and facilities to the Municipality's facilities at the Point of Delivery, including stepdown transformers where service is supplied at the Municipality's distribution voltage.

. . . .

"ARTICLE VII

"METERING

"The amount of electric power and energy delivered to the Municipality hereunder shall be measured at 4160 wye volts at the Point of Delivery or adjusted to the Point of Delivery by suitable metering equipment furnished, installed, maintained, calibrated, and read by the District at its expense."

Under the above provisions of the wholesale power contract, NPPD is required to deliver electricity at distribution voltage, i.e., 4.16 kV, or 4,160 volts. In order to make that delivery, the transmission voltage must be transformed. Meters to measure consumption by the distribution system would have to be placed on the low voltage side of the substation. A stepdown substation, including transformer, is essential to performance of the contract. In sum, if NPPD does not own the parts of the substation necessary to work the transformation, it must either lease or purchase from York the necessary equipment and site or it must acquire another site at the "points of delivery" and construct an additional substation, thus rendering the existing substation use-

less. Neither course would contribute to the public policy underlying Nebraska's encouragement of publicly owned utilities and of providing power to consumers at "as low overall cost as possible" and avoidance of "duplication of facilities." Neb. Rev. Stat. §§ 70-1001 and 70-655 (Reissue 1981); *City of Lincoln v. Nebraska P.P. Dist.,* 191 Neb. 556, 216 N.W.2d 722 (1974).

The City of York itself would benefit financially by a sale or lease of the substation to NPPD, but the statutes authorizing such sale do not require it to use the proceeds of the sale for the benefit of electrical utility customers within the municipality. Neb. Rev. Stat. § 70-504 (Reissue 1981).

We conclude that the trial court was clearly wrong in its determination of the issue. We reverse and remand with directions to enter a judgment finding that all of the equipment of the substations on the low voltage side is the property of York; that the superstructure and all equipment, including transformers on the high voltage side of the substations, are the property of NPPD. The evidence makes it clear that both York and NPPD must have access to each substation for maintenance of its property and to protect its facilities thereon and those other utility properties connected thereto. Accordingly, we direct that title to the sites, i.e., the real estate, be quieted in the Nebraska Public Power District and that the City of York be granted an easement of ingress and egress thereon so long as the sites are used for present purposes. Any practical problems related to the common use of the sites and equipment of the parties connected to the substations will have to be worked out by agreement between the parties.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., participating on briefs.

KRIVOSHA, C.J., dissenting.

I must respectfully dissent from the result reached by the majority in this case. The majority result is

premised upon a principle with which I agree, but an application which is wrong. I think it is clear from an examination of the applicable statutes that, indeed, the legislatively declared public policy underlying the encouragement of publicly owned electric utilities is to provide power to consumers at reasonable rates and at as low overall cost as possible, and to avoid duplication of facilities. See Neb. Rev. Stat. §§ 70-655, 70-1001 (Reissue 1981). My disagreement arises by reason of my belief that the majority opinion in this case has brought about just the opposite result. By including in the "transmission system" of NPPD the substations involved in this action, the majority opinion has simply increased the overall wholesale rate to *all* communities rather than imposing upon the consumers in York the cost of the stepdown substations used solely and wholly for the purpose of distributing electricity within the municipality involved. That does not appear to me to be in keeping with the legislative intent or with the language of the statutes involved.

The majority opinion suggests that the testimony of NPPD establishes that the substation serves a function as part of the "transmission system" rather than the "distribution system." The statute in question, however, Neb. Rev. Stat. § 70-650.01 (Reissue 1981), does not talk about a "transmission system." It speaks only of a "distribution *system*" and "transmission *lines*." The pertinent portion of § 70-650.01 reads as follows: "[T]he said district shall convey without cost all of its right, title and interest in and to its electric distribution system, as distinguished from its generating plants and transmission *lines,* to the said city or village within the territorial limits of which such system is located." (Emphasis supplied.) It appears from a reading of the applicable statute that the Legislature intended to distinguish the transmission *lines* from the distribution *system,* and not some enlarged transmis-

sion system as suggested by the majority. The use of the words "transmission lines" by the Legislature appears to be consistent with its obvious intent of separating the cost of wholesale power from the cost of retail power, imposing upon all of the communities within the wholesale district the cost of transmission while limiting to the particular municipality the cost of distribution, including the taking of the electricity from the transmission line. That desire would be fully consistent with the Federal Power Commission's definition for accounting purposes of the transmission system and would bring about a result which the Federal Power Commission's definition was designed to accomplish and which is used by investor-owned utilities to segregate the wholesale cost from the retail cost.

While there is testimony which may support a claim that under certain circumstances stepdown substations such as the ones involved herein may be considered a part of a "transmission system," there is no question that they cannot be considered a "transmission line." This explains why, at the time that NPPD, formerly Consumers, took over the York facilities, these substations were carried on the books of Iowa-Nebraska as distribution substations, and why Consumers continued to inventory them in that manner until sometime between 1965 and 1970 when they were changed from distribution to transmission for accounting purposes by NPPD. The record in this case is without dispute that the only purpose of these substations is to distribute power to the service area of the City of York. NPPD acknowledges that the sole transmission function of the substations consists of four line switches at Platte Avenue and one line switch at Delaware Avenue, each of which could be placed separate and apart from the substation structure.

Furthermore, the fact relied upon by the majority that NPPD and York entered into a wholesale con-

tract which requires NPPD to deliver wholesale power at a certain location or at a certain voltage merely begs the question. The decision as to whether a substation is a part of the distribution system or the transmission line is dependent upon what the Legislature and the applicable statutes intended and not what NPPD and the City of York may have agreed to subsequently. The contract may simply be wrong. While I may not agree with the trial court as to the basis of its conclusion, I do agree that these substations are a part of the "distribution system" and not a part of the "transmission line" and therefore, under the provisions of § 70-650.01, should be the property of the City of York. I would have affirmed the judgment of the trial court.

CAPORALE, J., joins in this dissent.