CITY OF O'NEILL, NEBRASKA, A MUNICIPAL CORPORATION,
ET AL., APPELLANTS, V. CONSUMERS PUBLIC POWER DISTRICT,
A PUBLIC CORPORATION AND POLITICAL SUBDIVISION OF THE
STATE OF NEBRASKA, ET AL., APPELLEES, LOUP RIVER PUBLIC
POWER DISTRICT, A PUBLIC CORPORATION, INTERVENER-
APPELLANT.

140 N. W. 2d 644

Filed February 25, 1966. No. 36090.

Norman Gonderinger, for appellants.

Wilson, Barlow & Neff, Julius D. Cronin, and Robert G. Simmons, Jr., for appellees.

Schmid, Ford, Snow, Green & Mooney and Lyle Winkle, for intervener-appellant.

Crosby, Pansing, Guenzel & Binning, for amicus curiae.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

McCOWN, J.

This is a declaratory judgment action to determine whether or not an agreement between the City of O'Neill and Consumers Public Power District was valid and enforceable. The district court declared the agreement to be valid and enforceable, and dismissed the petition in intervention filed by Loup River Public Power District.

The City of O'Neill, Nebraska, will hereafter be referred to as O'Neill; Consumers Public Power District will be referred to as Consumers; and Loup River Public Power District will be referred to as Loup.

On March 17, 1964, an agreement was executed by O'Neill and Consumers, to which a wholesale power contract is attached. Essentially, the agreement provides that Consumers will convey its electric distribution system in O'Neill to the city on or after January 1, 1972, in accordance with the requirements of section 70-650.01, R. S. Supp., 1963. If and as of the time O'Neill acquires the electric distribution system, the wholesale power contract attached becomes effective for the 25-year term provided. Consumers agrees to pay to O'Neill 2 percent of the gross retail revenue received from its operations in O'Neill during the period from the date of the agreement until December 31, 1971, and at least 7 percent of the retail revenue received after December 31, 1971. At the option of O'Neill, Consumers will offer to enter into a contract to operate the distribution system if and at the time O'Neill requests that the distribution system be conveyed to it. If Consumers enters into any agreement with any other city or village in Consumers' eastern system granting larger payments of gross revenue, or

more favorable terms for the purchase of wholesale power from Consumers than are granted to O'Neill, Consumers will offer to renegotiate the agreement so as to give equal rights, terms, and conditions to O'Neill.

The wholesale power contract made a part of the agreement is for a period of 25 years beginning with the date O'Neill acquires the electric distribution system located in O'Neill. Under this contract, O'Neill agrees to purchase and Consumers agrees to sell all of the electric energy required in the operation of the electric distribution system. The contract gives O'Neill the right to obtain its "load growth" from a source other than Consumers upon 3 years' notice to Consumers. However, O'Neill remains obligated during the full 25-year term to purchase from Consumers power equal to the average of the maximum power furnished during the same month in each of the 3 years prior to the date set out in the notice. The contract requires O'Neill to pay for the wholesale power according to Consumers' standard wholesale rate schedule. Consumers is required to fix a new schedule of rates applicable to service under the contract effective on or before January 1, 1972, and is given power to revise its rate schedules not oftener than once each 5 years thereafter.

The factual background and expressed purpose of the agreement are important here. The preliminary recitals in the agreement are:

"Previous to 1944, Consumers purchased the electric distribution system located in the Municipality and borrowed the funds for such purchase by issuing and selling revenue bonds which were refunded in 1944 by the issuance of Refunding Revenue Bonds. Thereafter, in 1945, the Legislature passed what became Section 70-650.01, R. R. S. 1943 which has been interpreted to permit the Municipality to acquire the distribution system within its territorial limits without cost in accordance with that section, when the Refunding Revenue Bonds are fully paid on January 1, 1972.

"During the remaining years until 1972, Consumers is obligated to assure the Municipality and its inhabitants and those of approximately 300 other cities and villages and intervening rural customers served by Consumers of good service and an adequate supply of power to satisfy the ever growing electrical loads. To do this it will be necessary for Consumers to continue to sell additional revenue bonds to provide the funds to construct additional power supply facilities, consisting of transmission lines, substations and possibly electric generating plants.

"The excellent credit rating which Consumers now enjoys in financial circles has been developed over the years since the original acquisition and will permit Consumers to sell such additional bonds at very favorable interest cost and other terms provided there exists suitable guarantees to the buyers of the additional bonds that the additional power supply facilities will continue to be used for the life of the bonds remaining unpaid after 1972.

"The purpose of this Agreement is to fix the right of the Municipality to acquire the distribution system as provided in Section 70-650.01 R. R. S. 1943 as amended in 1963; to assure the municipalities of a firm and adequate supply of electric power; to give assurance that the Municipality will continue to use the electricity supplied by Consumers with facilities financed by revenue bonds in addition to those issued for the acquisition of distribution property; and to provide other considerations."

The evidence confirms the recitals and establishes that Consumers will be issuing bonds payable in part after 1972 and long-term contracts will result in very substantial savings in bond interest. Consumers is and will be planning electric facilities which will have the larger part of their useful life after 1972. In order to plan and carry out its operations efficiently with qualified personnel, and to hold costs down for supplying elec-

tricity both before and after 1972, Consumers needs to have contracts to provide electric service after 1972. In the absence of a contract with Consumers, the approximately 300 municipalities which may acquire their retail distribution systems from Consumers January 1, 1972, could either build their own generating plants or buy power from someone other than Consumers.

The primary contention of O'Neill and Loup is that the payments to be made by Consumers until O'Neill takes over its distribution system are franchise payments in violation of Article VIII, section 11, of the Constitution of Nebraska. This constitutional provision, together with implementing legislation, authorizes all public corporations organized primarily to provide electricity or irrigation to make certain in lieu of tax payments to governmental subdivisions. A portion of the constitutional provision is: "The payments in lieu of tax as made in 1957, together with any payments made as authorized in this section shall be in lieu of all other taxes, payments in lieu of taxes, *franchise payments,* occupation and excise taxes, but shall not be in lieu of motor vehicle licenses and wheel taxes, permit fees, gasoline tax and other such excise taxes or general sales taxes levied against the public generally." (Emphasis ours.)

It is the appellants' position that the payments to be made by Consumers are franchise payments and are therefore prohibited by the constitutional provision. They contend that the payments are made in exchange for the right to do business at retail within the city limits, and that O'Neill has nothing else to offer in exchange for these payments but a franchise.

Consumers' position is that the payments are not franchise payments, but are voluntary contractual payments in exchange for a wholesale power contract for 25 years to take effect on the date the municipality takes over its electric distribution system.

Consumers is presently operating the retail electric

distribution system in O'Neill under a franchise granted by O'Neill in 1960 and extending to January 1, 1972. That franchise is not in any way questioned here. The appellants cite numerous decisions which hold, in general, that a franchise confers the right to use or occupy the streets to conduct the business of a public utility; and is required to be conferred by public authority. Aside from the obvious fact that Consumers has had a franchise since 1960 which extends to 1972, the general proposition relied on by appellants is not determinative of the problem with which we are here concerned. As stated in Washington Fruit & Produce Co. v. City of Yakima, 3 Wash. 2d 152, 100 P. 2d 8, 128 A. L. R. 159: "There is a practical unanimity in the cases upon the subject, to the effect that a contract made with a municipality for the sale and delivery to it of light or power is not a franchise, even though there is an implied grant of such use of the city's streets as may necessarily be involved in the performance of the contract."

The appellants' position not only ignores the fact that Consumers already held a franchise, but also ignores the fact that the only thing given or granted by O'Neill under the agreement of March 17, 1964, is not a franchise, but is a contract to purchase electricity when and if O'Neill acquires the distribution system involved in the agreement. It might be noted here that the Legislature has subsequently indicated its clear intention not only that O'Neill will acquire the distribution system, but that Consumers shall divest itself of all such retail systems. Laws 1965, c. 58, p. 265.

In a transaction such as this, a municipality does not exercise its legislative functions, but only its business or proprietary powers. See Northern States Power Co. v. City of Granite Falls, 186 Minn. 209, 242 N. W. 714.

Payments made by a public power district to a municipality under the facts and the agreement here involved are not franchise payments within the meaning of Article VIII, section 11, of the Constitution of Nebraska.

The appellants next contend that the agreement of March 17, 1964, is in violation of public policy for a number of reasons. Among them are that the payments to be made by Consumers to O'Neill until O'Neill takes over the electric system are not authorized under implied powers of Consumers; would result in discriminatory rates for Consumers' other customers; and constitute the taking of funds from electrical customers of Consumers to aid the general welfare of taxpayers of O'Neill.

Consumers' powers are set out in sections 70-626 and 70-655, R. R. S. 1943, and 70-625, R. S. Supp., 1963. These powers have been summarized as intended to permit the business of the district to be operated in a successful and profitable manner. Under section 70-626, R. R. S. 1943, Consumers has specific power to own or operate any electric plants and to enter into any kind of contract or arrangements with any city for or incident to the exercise of those powers, and for the sale of electrical energy.

All the arguments of appellants that the payments by Consumers to O'Neill are in violation of public policy boil down to the contention that these payments are not proper operating expenses and result in an unauthorized gift to O'Neill. This argument ignores the fact that O'Neill has contracted to purchase power from Consumers for a period of 25 years from the date O'Neill takes over the distribution system. It also ignores the fact that from the standpoint of Consumers, and under the facts and circumstances then present, it was not only a reasonable operating expense, but almost an imperative one. The appellants rely upon cases such as United Community Services v. Omaha Nat. Bank, 162 Neb. 786, 77 N. W. 2d 576. That case involved a gift to charitable organizations. Even though the court held a charitable gift unauthorized there, the following language was quoted with approval: " 'The authority given a municipality to engage in the operation of a busi-

ness enterprise carries with it the power to conduct it in the same manner in which a private corporation would deal with its property under similar circumstances.'"
See, also, Nelson-Johnston & Doudna v. Metropolitan Utilities Dist., 137 Neb. 871, 291 N. W. 558.

The contention that the payments by Consumers to O'Neill result in discriminatory rates rests on the same assumption that only a gift is involved. If an indirect operating expense, justified by sound business reasons, may be treated as a gift, almost any indirect operating expense directed toward a particular class of customers would result in discrimination and a violation of public policy under the appellants' theory. The evidence shows that no increase in rates to any of Consumers' customers will be involved and also that Consumers offers agreements such as this to all of the municipalities in which it operates retail distribution systems.

The appellants also contend that the agreement here is against public policy because Consumers might continue to operate the electric system in O'Neill at retail perpetually, and on such an assumption, it has no termination date. Since the agreement here was signed, the Legislature has directed generally that Consumers shall not continue retail operations in municipalities after 1972. Laws 1965, c. 58, p. 265. It should be remembered also that both municipalities and public power districts are subject to the plenary control of the Legislature. Platte Valley Public Power & Irr. Dist. v. County of Lincoln, 144 Neb. 584, 14 N. W. 2d 202, 155 A. L. R. 412.

It is also contended that in any event, for a period of 25 years, O'Neill will be subservient to and at the mercy of Consumers, and that the agreement, in fact, is in restraint of trade and creates a monopoly. The appellants rely almost entirely upon the case of Custer Public Power Dist. v. Loup River Public Power Dist., 162 Neb. 300, 75 N. W. 2d 619, on rehearing, 162 Neb. 821, 77 N. W. 2d 590. Since that decision, however, the Legislature has

clearly indicated that public policy now requires the elimination of conflict and competition between public power agencies, whether public power districts or municipalities. The Legislature now imposes restraints on competition and encourages combinations and agreements between publicly owned power agencies. Whatever justification there may have been in 1956 for holding such contracts as violative of public policy has now been effectively removed by the Legislature. We stated in E. K. Buck Retail Stores v. Harkert, 157 Neb. 867, 62 N. W. 2d 288, 45 A. L. R. 2d 774: "The power of courts to invalidate contracts for being in contravention of public policy is a very delicate and undefined power which should be exercised only in cases free from doubt."

We hold that the agreement of March 17, 1964, does not violate the public policy of the State of Nebraska.

The appellants' next contention is that O'Neill does not have the authority to contract for the purchase of power for more than 5 years in view of the provisions of sections 17-528 and 17-528.03, R. R. S. 1943. Both of those sections are general sections dealing with franchises. They authorize second-class cities and villages to grant franchises for a period of not to exceed 25 years and to contract with the franchise holder for a period of not to exceed 5 years for the furnishing of light for the streets, lanes, alleys, and other public places and property of said city or village. The agreement here involved is not a franchise, nor does the power contract apply to the furnishing of light for the streets, lanes, alleys, and other public places and property of the city and the inhabitants thereof. Consequently, sections 17-528 and 17-528.03, R. R. S. 1943, do not apply.

The appellants concede that sections 70-501 and 70-502, R. R. S. 1943, and other statutory provisions authorizing power purchase contracts by cities would apply if O'Neill had acquired its electric distribution system from Consumers. None of these statutes place any time limitations on such contracts. Appellants rely on Inter-

state Power Co. v. City of Ainsworth, 125 Neb. 419, 250 N. W. 649, which held that sections 70-501 and 70-502, R. R. S. 1943, did not apply to a city which does not own any electric light or power plant or distribution system.

The power contract here becomes effective "If and as of the date the Municipality acquires the electric distribution system located within or partly within the Municipality * * *." When the power contract becomes effective, O'Neill will have its own distribution system. There is nothing in the legislative declarations which implies that there is anything wrong with a muncipality looking ahead and making contracts for the purchase of electricity for its distribution system when it obtains it. To require a city to wait until it has received its distribution system before contracting for electricity was certainly not intended by the Legislature, nor expressed in the statutes. A second-class city has authority to execute a contract with a public power district to purchase the wholesale power requirements of the distribution system located in the municipality for a period of 25 years, effective when the municipality acquires the distribution system. To the extent that Interstate Power Co. v. City of Ainsworth, *supra*, is in conflict, it is overruled.

Finally, the appellant Loup asserts that the district court erred in not allowing intervention of Loup after trial, but before judgment. A petition in intervention to be filed as a matter of right must be filed before trial. See Kirschner v. Gast, 169 Neb. 404, 100 N. W. 2d 65.

The interest required to permit intervention is a direct and immediate legal interest of such a character that the person seeking to intervene will either lose or gain by the direct operation and legal effect of the judgment which may be rendered in the action. Noble v. City of Lincoln, 158 Neb. 457, 63 N. W. 2d 475. Loup's allegations show that its interest in the contract involved here is its desire to compete in the furnishing of elec-

tric energy to O'Neill. Even if the contract here were held invalid, it is not at all certain that O'Neill would buy from Loup. An indirect, remote, or conjectural interest in the result of the suit is not enough to permit intervention. Cornhusker Electric Co. v. City of Fairbury, 131 Neb. 888, 270 N. W. 482.

For the reasons stated, the judgment of the district court was correct in all respects and is affirmed.

AFFIRMED.