JEFFREY LAKE DEVELOPMENT, INCORPORATED, A NEBRASKA NONPROFIT CORPORATION, AND MIDWAY WILDLIFE AND RECREATION CLUB, A NEBRASKA NONPROFIT CORPORATION, APPELLEES, V. CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DISTRICT, A NEBRASKA PUBLIC CORPORATION, APPELLANT.

568 N.W.2d 585

Filed August 26, 1997.   No. A-96-171.

Michael C. Klein and Robert J. McCormick, of Anderson, Klein, Peterson, Swan & Bogle Louthan, for appellant.

Steve Windrum for appellees.

HANNON, MUES, and INBODY, Judges.

HANNON, Judge.

In the instant case, Jeffrey Lake Development, Incorporated (Jeffrey), and Midway Wildlife and Recreation Club (Midway), two homeowners associations that separately leased real estate surrounding Jeffrey and Midway Lakes, respectively, brought an action against the lessor, Central Nebraska Public Power & Irrigation District (Central), to enjoin it from unilaterally modifying the terms of their leases in order to provide for the payment of rent. (The controversy in this case is similar to that in *Johnson Lakes Dev. v. Central Neb. Pub. Power,* ante p. 957, 568 N.W.2d 573 (1997), except for the fact that in *Johnson Lakes Dev.,* Central specifically reserved the right to unilaterally terminate the lease.) Central generally asserted that the leases were "not now in full force and effect" because (1) the leases have a perpetual existence and do not require the payment of rent, (2) the leases terminated in 1987 when Central's 50-year Federal Energy Regulatory Commission (FERC) license expired and the FERC issued a renewable 1-year license rather than an additional 50-year license, and (3) when the

leases were entered into, a member of Central's board of directors was a sublessee of a lot from Jeffrey. Upon the parties' motions for summary judgment, the trial court found that the existing leases were valid and, therefore, enjoined Central from attempting to unilaterally modify them to impose rent on the plaintiffs and their sublessees. We now reverse in part the trial court's decision because these matters cannot be properly decided on a motion for summary judgment.

## I. SUMMARY OF EVIDENCE

Before delving into the facts in the instant case, we feel it is necessary to clarify the scope of the record. The bill of exceptions consists of affidavits which attest to various actions taken by people, documents, and answers to requests for admissions and interrogatories. We observe that at the hearing on the motions for summary judgment, the plaintiffs' attorney asked the trial court to take judicial notice of exhibits 1 through 18 in the *Johnson Lakes Dev.* cases cited above (though we note that the *Johnson Lakes Dev.* record contains only exhibits 1 through 14), and Central's attorney did not object. The trial judge stated that he would do so. We call the parties' attention to the fact that no rule exists which allows a court to take judicial notice of evidence that was offered in some similar case. The mere fact that a piece of evidence is somehow available to the judge in the trial court's records does not constitute a ground for taking judicial notice of it. In this particular case, the referenced exhibits from the *Johnson Lakes Dev.* cases are available to this court, and therefore, we are able to treat the offer and the statement of no objection as a stipulation to admit the referenced exhibits as evidence. We will therefore consider this evidence on that basis. Without that stipulation, however, we would not be able to do so. All too frequently this court struggles with an inadequate record because an attorney seeks to avoid the necessity of preparing and offering exhibits into evidence. However, our action is not the taking of judicial notice. Having defined the scope of the record, we can now proceed with a recitation of the facts.

The plaintiffs are nonprofit associations formed to manage the land that they lease from Central. The land demised to the

plaintiffs by the leases surrounds lakes which were constructed as part of power generation and irrigation projects. The record does not contain a history of the projects' development, but it is clear that the recreational aspects of these lakes have been developed over many years.

The plaintiffs have leased the land in question from Central for years, dating back prior to 1980. The plaintiffs have, in turn, subleased most of that land in single lots to individuals for between $25 and $75 per lot per year. These sublessees have built homes and cabins and have made other improvements to facilitate use of the recreational opportunities afforded by the lakes. To some degree, boat docks, lake access, comfort stations, et cetera, have been developed and constructed in order to facilitate the recreational use of the water by the general public, as opposed to just the sublessees. Maps show that while some of the land around the lakes is also leased to the Nebraska Game and Parks Commission, most of it is not leased.

On May 1, 1980, Central and Jeffrey entered into a new lease for real property on Jeffrey Lake, and on May 1, 1981, Central and Midway entered into a nearly identical new lease for the real property on Central Midway Lake, Walker Lake, Glen Young Lake, and the connecting canal (collectively known as Midway Lake). Both leases reflect that the plaintiffs held existing leases at the time the new leases were signed and that all prior existing agreements were terminated by the new leases.

The leases are 5½ pages in length, single spaced, and difficult to summarize. Except for one provision concerning Central's FERC license, there is no dispute about the meaning of the various provisions. The consideration is listed as the mutual covenants, promises, and agreements. Significantly, however, neither lease contains a provision requiring the plaintiffs to pay rent to Central.

The "primary term" of the leases is 31 years, but an obtuse paragraph, which provides for an automatic annual 1-year extension, can only be interpreted as making the leases perpetual in duration, unless the leases are terminated or modified by the agreement of the parties. While some lawyer should spend considerable time in purgatory for having drafted a paragraph so dedicated to confusion, none of the parties maintain that the

paragraph makes the leases anything but perpetual. Therefore, we shall not quote or discuss it.

Unlike the lease in the *Johnson Lakes Dev.* case, which gives Central the power to unilaterally terminate the agreement, the leases in the instant case do not give either party an automatic right of termination. However, in both leases, the lessee makes a great many promises and covenants, the breach of any of which is grounds for termination by Central. We will attempt to set forth some of these provisions later in this opinion. A fair summary of these promises would be that under the direction and control of Central, the lessees are required to develop, foster, manage, and maintain the leased area for the recreational benefit of the sublessees and other members of the public. The leases even provide that the lessee must expend all its revenues maintaining the premises and account to Central for all its revenues and expenditures.

While the leases do not give Central a unilateral right of termination, they do allow Central to terminate in part for any land that it needs for water storage, et cetera, and upon any "uncorrected" default or breach of the lessees' obligations. The leases also require the lessees to deliver possession of the premises to Central in the event that the FERC did not renew Central's 50-year license that was due to expire on July 30, 1987.

In 1994, Central's board of directors determined that it was time to start charging rent for the lease of the land surrounding its lakes (Johnson Lake, Jeffrey Lake, Midway Lake, and Lake McConaughy). Consequently, on March 4, 1994, Central's board of directors passed resolution No. 94-2, which authorized Central to enter into modification agreements with the lake associations to provide for, among other things, "the payment of fair and reasonable rent" for the benefits received from the use of Central's property. According to the resolution, each lake association had until June 1, 1994, to enter into such a modification agreement with Central. If any lake association failed to enter into a modification agreement, Central was authorized to begin the process of canceling or terminating any of the leases. Two unsigned modification agreements, which are attached to the plaintiffs' petition, reveal that Central's idea of fair and reasonable rent for lakefront property ranged from $300 in 1995 to

$575 by 1999 (second-tier sublessees, those farther from the lake, would pay 50 percent of the annual rental amount paid by a lakefront sublessee). The plaintiffs then filed this declaratory action, seeking to prevent Central from modifying the leases or interfering with their rights.

In their second amended petition, the plaintiffs allege that under their leases, they subleased the platted lots; that their sublessees placed valuable improvements upon the lots; that they and their sublessees fully performed under the leases; and that commencing March 7, 1994, Central approved a course of conduct intended to extract rent from the plaintiffs and their sublessees. The plaintiffs then specified the rights which they claimed were violated by Central's attempt to extract rent from them. In a "Second Cause of Action," the plaintiffs specifically alleged 16 terms and conditions of their leases which they believe Central's attempt violated.

The plaintiffs prayed for (1) an order permanently enjoining Central from taking any action to enforce or attempting to enforce any of the provisions of resolution No. 94-2 and the proposed modification agreements, (2) a judgment declaring the rights and duties of the parties, and (3) a judgment declaring that Central had no right to unilaterally modify, change, delete, add to, supplement, or amend any of the provisions of the leases.

In its answer, Central denied that the leases were in full force and effect because (1) its 50-year FERC license had not been renewed as required by paragraph 31; (2) the leases were contrary to public policy, ultra vires, and void; and (3) with respect to the Jeffrey lease, at the time of its execution, C.J. Hargleroad was both a member of Central's board of directors and a sublessee of Jeffrey. Central also filed a cross-petition, seeking an adjudication of the rights of the parties under the leases. A large portion of Central's answer and cross-petition was stricken by the court on the plaintiffs' motion. However, the court also found that "no further pleading is necessary on the part of the Defendant after those paragraphs have been stricken from [its] answer and crosspetition." (Although the court struck most of Central's defenses and allegations, it still addressed those arguments on the parties' motions for summary judgment.)

After a hearing on the parties' motions for summary judgment, the court made the following findings: (1) The leases were clear and unambiguous; (2) the leases had not been terminated under paragraph 31, the FERC license-renewal provision; (3) the leases were not ultra vires or contrary to public policy because there was consideration passing between the parties and because the automatic renewal provisions were clearly set forth in the leases; and (4) only the sublease between Hargleroad and Jeffrey should be declared void. (We note from the pleadings that neither the plaintiffs nor Central requested cancellation of the sublease.) The court thus sustained the plaintiffs' motion for summary judgment, overruled Central's motion for summary judgment, and enjoined Central as follows:

> Therefore, the Court finds that the Defendant is enjoined from taking any action to enforce the provisions of Resolution 94-2 and proposed modification agreement, and from interfering with the rights, benefits, and enjoyments of the Plaintiffs or their sublessees under the respective agreements entered into between the Plaintiffs and the Defendant. The Court further finds that the Defendant may not unilaterally alter the agreement of the parties and provide for rents due and owing under the lease agreement and that any provisions for the application of rent may only be enforced in a new agreement entered into between the parties.

After Central's motion for new trial was overruled, it appealed to this court.

## II. ASSIGNMENTS OF ERROR

Central contends that the district court erred in sustaining the plaintiffs' motion for summary judgment, in overruling its motion for summary judgment, and in overruling its motion for new trial. It also specifies the various errors at law which it maintains brought about these errors. Specifically, Central contends that (1) the leases were contrary to public policy and ultra vires and therefore void; (2) its 50-year FERC license had not been renewed and thus, under paragraph 31 of the leases, it was entitled to possession of the leased properties; and (3) the lease with Jeffrey was void because Hargleroad, a member of Central's board of directors at the time of the signing of the

lease, was an interested party under Neb. Rev. Stat. § 70-642.02 (Reissue 1996).

## III. STANDARD OF REVIEW

■ Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Moulton v. Board of Zoning Appeals*, 251 Neb. 95, 555 N.W.2d 39 (1996); *Polinski v. Omaha Pub. Power Dist.*, 251 Neb. 14, 554 N.W.2d 636 (1996). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Moulton v. Board of Zoning Appeals, supra*; *Polinski v. Omaha Pub. Power Dist., supra*.

■ Although the denial of a motion for summary judgment is not a final order and thus may not be appealed, when adverse parties have each moved for summary judgment and the trial court sustained one of the motions, the reviewing court obtains jurisdiction over both of the motions, may determine the controversy which is the subject of those motions, and may make an order specifying the facts which appear without substantial controversy and directing such further proceedings as it deems just. *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993); *Nu-Dwarf Farms v. Stratbucker Farms*, 238 Neb. 395, 470 N.W.2d 772 (1991).

■ An appellate court has an obligation to reach a conclusion regarding questions of law independent from the conclusion reached by the trial court. *Schrempp and Salerno v. Gross*, 247 Neb. 685, 529 N.W.2d 764 (1995).

## IV. ANALYSIS

### 1. ARE LEASES VOID AS AGAINST PUBLIC POLICY AND ULTRA VIRES?

Central argues that the leases are void as against public policy and ultra vires for two reasons: (1) because the terms of the leases are perpetual and (2) because the leases do not provide for rent. Before we proceed with an analysis, we set forth some

general principles of law which are helpful to the resolution of the instant case.

■ Generally speaking, an ultra vires contract is one made by a corporation beyond the scope of its corporate powers. Black's Law Dictionary 1522 (6th ed. 1990).

> An *ultra vires* contract of a municipal corporation is one which the corporation has no power to make under any circumstances or for any purpose. A contract of a municipal corporation is *ultra vires* in its proper sense when the corporation has no power under existing legislation to enter into such a contract.

*Warren v. County of Stanton*, 145 Neb. 220, 226-27, 15 N.W.2d 757, 761 (1944).

> The doctrine of ultra vires has, with good reason, been applied with greater strictness to municipal bodies than to private corporations and, in general, a municipality is not estopped from denying the validity of a contract made by its officers where there has been no authority for making such a contract.

56 Am. Jur. 2d *Municipal Corporations, etc.* § 503 at 554-55 (1971).

> The authority to sell municipal property carries with it the power to decide upon the terms of the sale, and since this power is discretionary, a sale made under it cannot be annulled on the ground that the bargain was an improvident one. But the power to sell does not include the power to make a gift . . . .

*Id.*, § 552 at 606.

■ Concerning public policy, the Nebraska Supreme Court has recently stated:

> Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, the principles under which the freedom of contract or private dealings are restricted by law for the good of the community. [Citation omitted.] " ' "It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare

imperatively so demands. . . . '[T]he power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.' . . ." ' "
*Southern Neb. Rural P.P. Dist. v. Nebraska Electric*, 249 Neb. 913, 918, 546 N.W.2d 315, 319 (1996).

### (a) Length of Leases

Central argues that the leases are ultra vires because it, as a public power district, cannot contract for an unreasonable duration. We initially observe that a perpetual lease does not violate the rule against perpetuities or any other rule. *Ehrhart v. Spencer*, 175 Kan. 227, 263 P.2d 246 (1953). An argument similar to Central's was made by the defendant in *T.V. Transmission v. City of Lincoln*, 220 Neb. 887, 374 N.W.2d 49 (1985), where the defendant asserted that the reading given the contract by the court rendered it ultra vires because the defendant could not change the rent for a period of 20 years. The Nebraska Supreme Court recognized that the defendant was in essence arguing that 20 years was too long to have to live with the same terms and that the defendant was merely trying to escape from a bad bargain. In rejecting the defendant's argument, the court stated:

> There may be a point at which a contract for an unreasonably long duration may go beyond the objects for which a municipal corporation was created and therefore be ultra vires . . . but there is no evidence in this case that a minimum period of 20 years is an unreasonably long duration for the particular contract involved.

*Id.* at 894, 374 N.W.2d at 55.

Quoting 17 C.J.S. *Contracts* § 398 (1939), the Nebraska Supreme Court in *Faught v. Platte Valley Public Power & Irrigation Dist.*, 155 Neb. 141, 150, 51 N.W.2d 253, 259 (1952), stated: " 'However, a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract, and *a contract will not be construed as imposing a perpetual obligation when to do so would be adverse to public interests.*' " (Emphasis supplied.)

It is this last portion of the quote that we are concerned with in the instant case. It appears that the length of a lease is a con-

sideration in a determination of its validity or invalidity. However, in and of itself, the length of a lease is not sufficient to support a holding that there is no genuine issue of fact and that the lease is void as ultra vires or contrary to public policy. We, therefore, now proceed to address whether the lack of rental provisions, when combined with the perpetual terms, results in the leases' being ultra vires or against public interests or public policy.

### (b) Failure of Leases to Provide for Rent

In the instant case, Central did not charge the plaintiffs any rent. Central admits that the mutual promises and covenants contained in the leases are adequate consideration to support a contract but argues that the consideration received by Central is so inadequate that it constitutes a gift of public property. Central asserts that "[t]he disposition of this property to the Plaintiffs for them to manage and develop for their own benefit serves no corporate purpose." Brief for appellant at 20. While the record does not reveal the value of the lots around Jeffrey and Midway Lakes, it does show that individual lots at Johnson Lake and Lake McConaughy were valued between $9,000 and $20,000. The evidence further shows that the plaintiffs have leased the lots to their sublessees for an average annual rent of $50. We point out that the value of the lots and the amount of rent paid by the sublessees are facts not beyond dispute and therefore cannot be facts justifying a summary judgment. In addition, we note that facts showing the value of the lots and their rental value when the leases were signed, as opposed to at the time of trial, would be more relevant to the question of whether a gift was made by the execution of the leases.

Central argues that it is required by statute to charge rent. Power and irrigation districts are organized under chapter 70, article 6, of the Nebraska Revised Statutes. Neb. Rev. Stat. § 70-625 (Reissue 1976) explains the powers of such districts:

> Subject to the limitations of the petition for its creation and all amendments thereto, a public power district shall have all the usual powers of a corporation for public purposes and may purchase, hold, sell and lease personal property and real estate reasonably necessary for the conduct of its business . . . .

Accord § 70-625 (Reissue 1996).

Central argues Neb. Rev. Stat. § 70-655 (Reissue 1976) requires it to charge rent. That statute provides in significant part:

> The board of directors of any district . . . shall have the power and *be required* to fix, establish and collect adequate rates, tolls, *rents,* and other charges, for electrical energy, water service, water storage, and for any and all other commodities, services or facilities sold, furnished or supplied by the district, which rates, tolls, rents and charges shall be fair, reasonable, nondiscriminatory, and so adjusted as in a fair and equitable manner to confer upon and distribute among the users and consumers of commodities and services furnished or sold by the district the benefits of a successful and profitable operation and conduct of the business of the district.

(Emphasis supplied.) See, also, Neb. Rev. Stat. § 70-655 (Reissue 1996). As noted by the Nebraska Supreme Court in *City of O'Neill v. Consumers Public Power Dist.*, 179 Neb. 773, 779, 140 N.W.2d 644, 649 (1966), the powers set forth in §§ 70-625 and 70-655 are "intended to permit the business of the district to be operated in a successful and profitable manner."

A careful reading of § 70-655 discloses that it requires Central to collect adequate rent and other charges for its property. We conclude that this statute merely requires reasonable consideration and not necessarily the payment of cash.

The question of whether the leases had the effect of giving away the public's property cannot be considered without an understanding of the obligations that the plaintiffs agreed to in the leases. As indicated above, such provisions are numerous. Generally, the plaintiffs agreed to use and manage the leased premises for recreational and residential purposes and to be responsible for "the administration and supervision of each and every provision and condition" of the leases. We now set forth the specifics of the plaintiffs' obligations.

The plaintiffs agreed to prepare revised standard-form leases consistent with the terms of the leases and to submit the forms to all their sublessees within 120 days, to enter into new subleases within 1 year of the signing of the leases, and to provide Central with one representative copy of the residence lot lease

form and one copy of any other sublease within 30 days of becoming effective. The leases also vest the plaintiffs with general recreational responsibilities and require them to cooperate with local, state, and federal law enforcement agencies in the control and regulation of boating, swimming, and other uses of the property by the public. The plaintiffs further agreed to reestablish and reset any boundary stakes between lots as necessary at their own cost; to survey for new developments as needed; to remove all garbage, et cetera; to operate and maintain all public wells; to protect against adverse possessors; to use their revenues to maintain and improve the property; and to account to Central for their funds.

The leases also provide that the lake shoreline and canal lands shall be used exclusively for recreational purposes and not for commercial, industrial, or business uses. They further provide that lots may not be subleased to a person who has an interest in any other lot of land owned by Central. Several lengthy provisions contain guidelines for permanent reconstruction or new construction. The gist of these provisions is that the plaintiffs are charged with the task of determining whether proposed construction satisfies the terms of the leases, the regulations, and other requirements of Central; approving it if it does; and then submitting it to Central for its approval. The leases also require the plaintiffs to ensure that all structures be "sightly" and that all weeds be mowed or destroyed.

The above summary is intended only to list the obligations that the plaintiffs each agreed to assume under their leases in order that we may judge whether Central made an unlawful gift to the plaintiffs. It is not intended as an interpretation of the parties' rights and duties under the leases.

The leases also set forth some of Central's powers and duties. Specifically, the leases reserve in Central the right to store, use, vary, or maintain water levels as it deems proper. The leases require Central to maintain its recreational facilities for the use of the public without discrimination. However, the leases indicate that Central's primary purposes are to operate and maintain its works of public improvements and not to maintain recreation capabilities.

Central relies on *Custer Public Power Dist. v. Loup River Public Power Dist.*, 162 Neb. 300, 75 N.W.2d 619 (1956),

*motion for rehearing denied* 162 Neb. 821, 77 N.W.2d 590 (1956), in its argument that the leases are contrary to public policy and ultra vires. In *Custer Public Power Dist.*, one public power district contracted with another district to supply all of its power needs for 26 years. The *Custer Public Power Dist.* court held the contract void as against public policy because the effect of the contract was to give the one district a monopoly and to prevent the other from performing one of the purposes for which it was created for the full term of the contract. In so doing, the court quoted from 73 C.J.S. *Public Utilities* § 5 (1951):

> "As a general rule, public utilities have the right to enter into contracts between themselves or with others, free from the control or supervision of the state, so long as such contracts are not unconscionable or oppressive and do not impair the obligation of the utility to discharge its public duties."

162 Neb. at 315, 75 N.W.2d at 628. The court also noted that the public policy of the state as to power districts is the concept of electrical energy being furnished to the ultimate consumer at the lowest cost consistent with sound business judgment. *Custer* is distinguishable from the case at hand in that the leases in this case do not prevent Central from performing one of the purposes for which it was created, although they might make services more expensive or less of a bargain, depending upon the observer's point of view.

Central also repeatedly alleges and argues that the terms and conditions of the leases are unconscionable and oppressive and impair its obligation to discharge its public duties of furnishing electrical energy and irrigation water service to its ultimate consumers at the lowest cost consistent with sound business judgment. However, Central does not specify how the leases impair its obligation to its energy users or irrigators, and further, it denies any duty under its FERC license to maintain the lakes as recreational facilities. It relies upon the idea that if it received rent from the plaintiffs it would have more income and could therefore lower its charges to its electric energy and water users. Neither the petition as amended nor the FERC license specifically imposes on Central any duties toward fostering recreation,

but the Federal Water Project Recreation Act (approved July 9, 1965, Pub. Law No. 89-72, 79 Stat. 213, and codified, as amended, at 16 U.S.C. §§ 460*l*-5 and 460*l*-12 et seq. (1994)), which the Nebraska Legislature specifically assented to in 1976 Neb. Laws, L.B. 779, see Neb. Rev. Stat. § 81-815.53 (Reissue 1996), makes clear that the administrators of federally sponsored water projects, whenever such projects can reasonably serve both recreational purposes and purposes consistent with hydroelectric and other uses, shall construct, operate, and maintain such projects accordingly. That act further directs federal agencies to encourage the administrators of nonfederal projects to do the same.

In the instant case, the leases obviously do encourage recreational uses of the lakes. Undoubtedly, hydroelectric power, irrigation, and recreation all serve public purposes. It is certainly not appropriate for this court to decide which public purpose should be given precedence. If we were to declare the lease void as against public policy because it did not maximize Central's income or benefit the power consumer or the irrigator at the expense of those who use the water for recreation, we would essentially be choosing between competing public interests. We conclude that it is far better to allow the contract negotiated and drawn between Central, representing the electric power provider and irrigator on one side, and the plaintiffs, representing those interested in recreation on the other, to stand rather than make a judicial determination that one public interest supplants another. As observed by the trial court, *Occidental Sav. & Loan Assn. v. Venco Partnership*, 206 Neb. 469, 480, 293 N.W.2d 843, 849 (1980), states: " 'It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands.' " (Quoting *E. K. Buck Retail Stores v. Harkert*, 157 Neb. 867, 62 N.W.2d 288 (1954).)

The leases refer to the fact that they are new agreements that replaced previous leases. The evidence shows that none of the previous agreements provided for rent. The record contains practically no evidence concerning the parties' positions before the new leases were entered into. The evidence does, however,

reveal that Central's previous leases would not have expired until May 1, 1991, and September 16, 1997. Perhaps the opportunity to charge rent was not available when the current leases were drawn. The same might have been true when the previous leases were drawn. Central may well be in the same position the U.S. Government would be in if it now sought to cancel its land grants to the railroads on the grounds that much of that land is now worth thousands of dollars per acre, when it was next to worthless in the 1850's and 1860's.

It is impossible to judge whether these leases effectuated a gift of public funds to the lessees unless the expected cost to the lessees of fulfilling their promises, as well as the expected benefit to the governmental agency, were known at the time the leases were executed. In view of the fact that these leases are continuations of previous lease agreements, it would also be necessary to know the terms and conditions of the prior leases. Since this case was decided upon a motion for summary judgment, all such facts would need to be known without dispute and the inferences drawn from those facts would need to be certain. It is highly unlikely that such an issue could be disposed of on a motion for summary judgment, particularly if it requires the court to hold that the leases were a gift. On the other hand, it may be that in view of the situation of the parties at the time the new leases were signed, Central gave up substantial rights that it had under the existing leases, that the promises made by the plaintiffs in the leases were illusory, and that in effect Central did make a gift of the public's property by executing the leases.

We conclude that the evidence before us does not establish that there is no genuine issue of material fact on the issue of whether the leases gave the plaintiffs a gift of free use of the public's property.

## 2. CENTRAL'S FERC LICENSE

We have previously considered and rejected Central's argument regarding its FERC license in *Johnson Lakes Dev. v. Central Neb. Pub. Power, ante* p. 957, 568 N.W.2d 573 (1997). Paragraph 31 is nearly identical to that contained in *Johnson Lakes Dev.*, where we found that the provision made no distinction between an annual renewal of the FERC license and a 50-year renewal. Moreover, by not raising the issue for several

years after the expiration of its FERC license in 1987, Central waived the ground as a basis for terminating the lease. In the instant case, we again find that Central's argument lacks merit.

### 3. Is Jeffrey Lease Void Because Member of Central's Board of Directors Was Also Sublessee at Signing of Lease?

The record reveals that C.J. Hargleroad was a sublessee of Jeffrey from January 1, 1960, to September 28, 1985, and that he was a member of Central's board of directors in 1980 when the lease with Jeffrey was executed. Central maintains that its lease with Jeffrey is therefore void because this situation violates § 70-642.02, which provides in significant part:

> No member of the board of directors shall be interested, directly or indirectly, in any contract to which the district, or any one for its benefit, is a party . . . . Such interest in any contract by a director shall void the obligation thereof on the part of the power district.

In the past, the Nebraska Supreme Court has interpreted substantially similar language in the context of municipal officers. See, generally, *City of Lincoln v. First Nat. Bank*, 146 Neb. 221, 19 N.W.2d 156 (1945) (wherein it was held that when city councilman was stockholder, director, and officer of bank, city funds could not be deposited in that bank); *Neisius v. Henry*, 142 Neb. 29, 5 N.W.2d 291 (1942) (where chairman of public works board and general manager of city light and power plant was not allowed to draw two salaries); *Village of Bellevue v. Sterba*, 140 Neb. 744, 1 N.W.2d 820 (1942) (where member of board of trustees of village could not draw payment for work he did for Works Progress Administration).

The Nebraska Supreme Court has stated: " 'Where a statute prohibits an officer of a village from having an interest in any contract with the village, and avoids the obligation of any such contract so made, it is void for all purposes . . . .' " *City of Lincoln v. First Nat. Bank,* 146 Neb. at 227, 19 N.W.2d at 159 (quoting *Village of Bellevue v. Sterba, supra*). Furthermore, the Nebraska Supreme Court has said:

> " '[A] contract made by an officer of a municipality with himself, or in which he is interested, is contrary to public policy and .tainted with illegality; and this rule applies

whether such officer acts alone on behalf of the municipality, or as a member of the board of council. . . . The fact that the interest of the offending officer in the invalid contract is indirect and is very small is immaterial.' "
*City of Lincoln v. First Nat. Bank*, 146 Neb. at 229, 19 N.W.2d at 160.

A perusal of the three above-cited cases would convince any reader that Nebraska adheres to a strict interpretation of the rule that any interest by a public officer in a contract entered into in his or her official capacity results in the contract being declared void. Because a lease is merely a particular type of contract, the only remaining question is whether Hargleroad had an interest, direct or indirect, at the time the Jeffrey lease was entered into.

When the contract in question was entered into, Hargleroad was already a sublessee of Jeffrey. We have been unable to find any cases where the rights of a lessee or sublessee arising under an existing contract, which would not be altered by a new contract with a municipality, disqualify a city officer from representing the city in connection with a new contract. The terms of the new lease that Central entered into with Jeffrey provided for a renegotiation of the leases between Jeffrey and its sublessees, such as Hargleroad. The record does not contain either the previous leases between Central and Jeffrey or the previous sublease between Jeffrey and Hargleroad. Such evidence might establish that Hargleroad's rights would have been affected by a new lease between Jeffrey and Central. But the mere existence of the relationship could not establish that the new lease would effect, directly or indirectly, a change in Hargleroad's right as a sublessee of Jeffrey. Normally, unless the old lease provided that a new lease could affect the terms of the old lease, the entry into a new lease between a lessor and a lessee would not affect the rights of any sublessee.

Remembering that this matter was submitted to the court on the basis of the parties' motions for summary judgment, we conclude that summary judgment on this issue would be improper. The trial court did not determine that the lease between Central and Jeffrey was void but, rather, stated that the sublease between Hargleroad and Jeffrey should be declared

void. Perhaps the trial court did not intend its statement to be a judicial declaration concerning the sublease, but its journal entry reads as though it were one. We observe that there are no pleadings supporting a declaration of the validity of any sublease in this action and further that Hargleroad is not a party to this action. Therefore, any declarations regarding Hargleroad's personal interest in this action are wholly ineffective. To the extent that the district court purported to determine the rights of Hargleroad as a sublessee, the order should be vacated.

## V. CONCLUSION

We conclude that the trial court erred in granting summary judgment in favor of the plaintiffs because there is a genuine issue of material fact as to whether the leases were contrary to public policy and ultra vires. Further, we conclude that the trial court erred in declaring the sublease between Jeffrey and Hargleroad void because Hargleroad's interest was not at issue. However, we also conclude that the trial court did not err in refusing to grant Central's motion for summary judgment. The judgment of the trial court is thus affirmed in part and in part reversed, and the cause is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.